## ARONCE HARRIS v. STATE.

No. A-2958. Opinion Filed June 29, 1918.

(173 Pac. 958.)

1. **APPEAL AND ERROR—Reversible Error.** It is not error alone that reverses judgments of conviction of crime in this state, but error plus injury. and the burden is upon the plaintiff in error to establish to this court the fact that he was prejudiced in his substantial rights by the commission of error.

2. **SAME.** Where plaintiff in error was informed against for murder and convicted only of manslaughter, and under his own testimony he is at least guilty of the degree of crime of which he was con-

victed, this court will not reverse such judgment unless, after an examination of the entire record, it appears that the plaintiff in error was deprived of some constitutional or statutory right to his prejudice during the progress of the trial.

*Appeal from District Court, Tulsa County;*
*George C. Crump, Assigned Judge.*

Aronce Harris was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*R. P. Elliott,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. In view of the disposition the court makes of this case, it is necessary that a full understanding be had of the evidence upon which this conviction is based. The defendant was informed against for murder, and convicted of manslaughter in the first degree, and sentenced to serve a term in the penitentiary for a period of 25 years.

The defendant was a negro, and had been a resident of Tulsa, Okla., for about seven years at the time of the killing. He was a native of Louisiana, and had worked during most of the time he had been in Tulsa as a porter in the Diamond Drug Store, the place where this killing took place, the Baltimore Drug Store, and other similar institutions in that city, which were in reality booze joints conducted under the guise of the drug business.

The deceased, Joe Johnson, was a bootlegger. This is admitted by the state. He was a white man, and apparently had the reputation of being a scrapper, although not a man of large stature. He and the defendant were apparently well known to each other, and a short time before this killing the deceased hired defendant for the

sum of $2 to help him haul eight kegs of whisky from a place out on the M., K. & T. Ry., where same had been dumped off the train, to some place in the city for the purpose of concealment. It was over this transaction that this killing took place, about 8:30 at night, on the evening before the general election in November, 1914.

The theory of the state is that the defendant shot deceased because he refused to pay him the $2 that he had promised to pay for helping to haul the whisky. The defendant says that, after he had hauled the whisky for the deceased, the $2 was paid to him by Mr. Miles, proprietor of the Diamond Drug Store, for the deceased; but after the whisky had been concealed the deceased claimed that the defendant had stolen part of it, and kept threatening to kill him, on various occasions when they would meet, up until the night of the killing itself. The defendant testified that the deceased had punched a pistol into his stomach and told him if he did not produce the whisky he would kill him. These occurrences related by the defendant happened on the public thoroughfares of the city of Tulsa, for the most part, after dark had fallen. No witnesses were produced to any of these transactions except the defendant himself. He claims that on the evening of the killing in the Diamond Drug Store the deceased renewed his hostile demonstrations toward defendant, threatening to kill him; that the defendant knew there was a loaded shotgun behind the showcase on the northwest side of the storeroom, and that he believed the deceased would get that gun and shoot him; that he was afraid of the deceased, and shot him to prevent him from getting the gun and killing him (defendant). According to the witnesses for the state, this killing is a cold-blooded murder, and at the trial every eyewitness who was pro-

duced and who was in the drug store at the time of the killing testified for the state. There was no apparent conflict in the testimony of any of these witnesses except in the testimony given by the defendant, and, in order that a clearer understanding may be had of the state's theory, a synopsis of the testimony of two of the state's witnesses is incorporated herein, as follows:

"Allen Freeman says: I live in Tulsa, and lived there November 2, 1914. I knew Joe Johnson, now deceased, and also knew the defendant, Aronce Harris, at that time. On that night I was in the Diamond Drug Store when the defendant shot Johnson. It occurred between 8 and 9 o'clock at night. Just before, when I walked into the drug store, Joe Johnson was standing by the show case. There were in there several others, including Bill Grant, Frank Mitchell, Willie Wells, Ned Weaver, a boy by the name of Cole, and two girls sitting at one of the ice cream tables whom I didn't know. I had worked in that store about a year myself. The soda fountain was on the west side and the cigar case was on the east side of the storeroom, and each of these cases are 12 feet long. You enter the drug store from the south side, and as you go towards the prescription case the cigar case is on the right side, the soda fountain is on the left side, and it is about 30 or 40 feet from the entrance back to the prescription case. When I first went in there, the defendant was in there also, standing at the cigar counter and watching some boys shake dice for the cigars. I walked on back to the toilet room myself. The defendant had worked there as a porter and at the time I was working there as a clerk. At the time of the killing I was working at the Belmont Drug Store. As just mentioned, after about five minutes I returned from the toilet, came on back into the drug store, and Joe Johnson was standing there where the boys were shaking their dice about midway of the counter, and the defendant was standing there talking to Johnson. Johnson said as he walked away, like he was going to sit

down on one of the stools, 'You know I can't pay you; I haven't got the money.' I, myself, had turned to go where the boys were shaking dice about that time, and I heard some one say, 'You're not going to pay me, are you?' and out with a gun and went to shooting. I don't know whether Joe sat down or not. This defendant is sometimes called Geronimo, and I heard him say at that particular time, 'You're not going to pay me, are you?' Then he went to shooting so fast I couldn't tell how he was holding his gun, and I guess that Joe Johnson was trying to get away at that time; he staggered along down the showcase to the end of it, and fell against the prescription case. There were six shots fired. I walked right along behind defendant as he was firing them. Joe kept dragging himself along down the showcase, with blood running out of his mouth and his head hanging down, just hunting along the side of the case like. By the time he had fallen the boys run in and picked him up. I am not positive about the exact date of this, only I know it was the night before election. I afterwards saw Johnson's body at the undertaker's. I had seen this defendant on the morning before the killing about 9 o'clock at the Baltimore Drug Store, and he was trying to borrow a gun from me, and I asked him what he was going to do with it, and he said Joe Johnson was jobbing him around. I asked him what was the matter with Joe, and he said, 'I'm going to make the damn son of a bitch pay me.' Then I told him he'd better let him alone, and he turned around and walked away. There was nobody present at the time of this conversation, and it was there at the Baltimore Drug Store. And after Johnson had said this he sat down just as Geronimo came out with the gun and commenced shooting. The first shot was fired, then a short delay, and the other shots followed in quicker succession than was the first and second. The pistol was not an automatic, as I thought it was, but a double action 32.

I saw it here at the trial, but didn't have it in my hands. At the time of this killing I was working at the Baltimore Drug Store, as before stated, in the front part of the drug store. I have known Joe Johnson three or four years—just as one of the boys. I have no feelings whatever against this defendant. Johnson at the time I saw him was about the second stool of the soda fountain bar, and Johnson was either sitting down or started to sit down when the shooting commenced. I hadn't begun to look at him until I saw Geronimo start towards him. I do not know about there being a shotgun behind the showcase."

"W. B. Grant says: They call me Willie Grant, and I lived in Tulsa, 1914, and know the defendant, Aronce Harris, and knew Joe Johnson, a white man, while he lived. I remember when the killing occurred, and it occurred about 9 o'clock in the evening where I was at work at the Diamond Drug Store. Joe Johnson had come to the drug store some two hours before on that evening; he was around there a great deal. I think probably he was there at 7 o'clock that evening. I also think he was there two hours before the shooting. I also saw defendant, Harris, there that evening, and both of them had been there pretty much all that evening. Harris was not working at the store at that time, but was in there that afternoon. Just before the shooting I and the defendant had been talking together; in fact, we had talked a long time together that evening, and in different parts of the store, and in front of the prescription case, and defendant and deceased talked to each other for a good while. I never heard what it was about. It was quiet talk, and I didn't know anything that was said. Neither of them seemed excited, and the defendant didn't appear to be drinking at all; Johnson was sober, too, I am sure. Just before the shooting I was waiting on people, and didn't notice anything unusual between them at all. At the time the shooting commenced I was sitting back at the soda

table and about 20 feet from the defendant and deceased. I heard the shooting, and Johnson at the time was sitting next to the last stool at the soda fountain—movable stools with wire legs. He was at the next to the last one towards the north. There were two or three shots fired while he was yet on the stool, and then he raised up, staggered, and he might have touched the showcase, and the blood was gushing out of his mouth, and he staggered on to the back of the store, turned west, went a few feet, and fell dead about the center of the store. I think there were two or three shots fired before he ever got off the stool. I was facing him and saw the blood gush out of his mouth. I saw the defendant also. During the shooting defendant advanced on Johnson some four or five steps, firing rapidly. There was five or six shots fired in all. After the shooting was over defendant trotted right out the front door and I didn't see him any more. Willie Wells and myself went back to Johnson, raised him up, and saw that he was dead. He had no pistol or any sort of arms on him, but we didn't go through his pockets. The next man who got to him was a doctor, although there were two or three people in there at the time. The door was closed, and there was a big crowd when that two or three come in there. I don't know who they were. Possibly some of them were policemen who got there right away, and then the ambulance came at once, and then the store was locked when the ambulance went away, and remained locked the balance of that day. At the time of the shooting I was sitting back at one of these tables talking to two ladies. I had been there perhaps ten minutes talking to them, and the first thing that attracted my attention was the shot. I was facing in that direction all the time, was tending to business, was working at the place. Just prior to the shooting Johnson was sitting at the soda fountain; before that he and Geronimo had a long conversation but I didn't know what it was about. I don't

know whether Johnson was armed or not. He was on the west side of the building when shot, and in four or five feet of the counter. In that building there is a runway or space between the two showcases, which are eight feet long each. The showcase is eight feet long, and he was sitting near the corner of the showcase on a stool, and in four or five feet of the showcase, and was sitting down. I didn't see him move prior to the first shot. I had worked at the Diamond Drug Store possibly two years or three. It seems to me the defendant had worked at the drug store about a year—he was porter. I myself was prescription clerk."

Dave Collins, one of the principal witnesses on behalf of the defendant, testified in part as follows:

"Q. How far was Johnson from that shotgun when he got shot? A. Well, it was about twenty feet. Q. Was it as far as from here to that gate? A. No, sir. Q. Half as far? A. There were two showcases. From the distance between the two showcases, about ten feet long. Q. How long would it have taken Johnson to leave the stool or the place where he was sitting and go back and get that shotgun and come back with it? A. Depend on how fast he was going. Q. If he go quick as he could? A. Wouldn't have taken long. Q. About how long? A. Not long. Q. Well, would it take an hour? A. No, sir. Q. Well, then, about how long? A. I can't say; maybe in a minute or less than than that."

The defendant in his own behalf testified as follows:

"Q. What is your name? A. Aronce Harris. Q. Where were you raised? A. In Louisiana. Q. How long have you been in this country? A. About seven years. Q. Who have you been working for? A. Been working off and on for Mr. Miles. Q. What did you do for Mr. Miles? A. Porter. Q. Porter. At what place? A. Dif-

ferent places; Diamond Drug Store. Q. Did you ever do any work for Mr. Miles any other place? A. Worked out here in the country. Q. Has he got a place up there? A. Yes, sir. Q. How long were you there? A. Quite a while; two or three months at a time. Q. Did you know Mr. Joe Johnson? A. Yes, sir. Q. Will you state in your own way to the jury about the trouble you had with Mr. Johnson. Commence at the end and detail the whole story? A. On the 23d of October on Friday night— By the Court: Mr. Elliott, you had better ask questions. The court will rule that you will have to ask questions. By Mr. Elliott: You require me to ask questions? By the Court: Yes, sir. By Mr. Elliott: Q. State if you ever had any trouble with Mr. Johnson? A. I had trouble with him on the 23d. I had no trouble with him on the 23d. That was the night he hired me to go out and help haul whisky. Q. Did he employ you to help haul whisky? A. Yes, sir. Q. When was that? A. The 23d of October, Friday night. Q. The 23d of October, Friday night? A. Yes, sir; the 23d of October, Friday night. Q. Did you go with him? A. Yes, sir. Q. What were you doing? A. I was standing in the store writing a letter, and he asked me did I want to make two dollars. I told him yes. I asked what doing, and he said he wanted me to help him haul whisky; and I asked what about if the law caught me and I got in jail, and he said if I got in jail I wouldn't have to lay there longer than night, he would get bond and get me out. Q. You went with him, did you? A. I told him I would go. Q. And you did go? A. Yes, sir. Q. Where did you go? A. Went northwest to the Katy— north a mile and a half, and got eight kegs of whisky that had been thrown off of the train. Q. What did you do with it? A. Put four kegs in each buggy. By the Court: Q. Got it and carried it off, did you? A. Yes, sir; goes down and brought it in, and hides seven there and brought one back—one keg back and sold it to the boys. Q. What did you do? A. There were some white boys at the buggy, and we had done emptied it all but one

keg, and he sold it. He told me to take the buggy back to the barn and come by tomorrow and he would pay me. I told him got to go to work tomorrow, and he said come by and he would pay me. I says all right, I would. So I drives to the barn and leaves him out there. So I goes on back and goes to bed. The next morning I goes to work. That night I go into the store. Mr. Grant standing there by the cigar case, and I asked him if Mr. Miles had been in there, had he seen him; and he said, 'No, he would be down in a few minutes.' Q. Where did you next see Johnson? A. I went on to the post office—no more time to wait—and come back to the store and asked if Mr. Miles had been in there. He said, 'No,' so I would not wait for Mr. Miles; and Mr. Johnson walked over to me and hit his hand on my back. He said, 'Geronimo, I ain't got the money to pay you;' but says Mr. Miles, 'You see him and he will pay you.' I says—I told him all right. I waited until 9 o'clock, and Mr. Miles didn't come, and I asked Mr. Grant could he pay me. So he told me didn't know whether he had money enough in the register or not to pay me, but he would see about it. Q. What did you and Mr. Johnson do? A. He did not do anything then. Mr. Grant paid me. Q. For hauling this whisky? A. No, sir. Q. On another matter? A. Yes, sir. Q. Then where did you go? A. I went on back to the barber shop on Boston. Q. Well, when was the next time you saw Mr. Johnson? A. Well, that following Monday. Q. When was that; what day of the week was that? A. On the 26th, I think. Q. You know the day of the week—Friday, Saturday, or Sunday? A. On Monday. Q. When was it that you saw Mr. Johnson at the drug store? A. I did not see him before the 2d of November; that was that night the time of the killing. I did not see him at the store before I saw him on the 26th of October. Q. Well, what occurred then? A. He come up to the store. Q. What store? A. The Diamond Drug Store. Q. What did you do up there? A. I got

balance of my money from Mr. Miles. He and another gentleman sitting at the desk talking. Q. Who? A. Mr. Miles and another gentleman, so I asked for my money and he got up to pay me. He says wait, he said he wanted to see me, and I told him all right. So I waited a few minutes and these other men come in there. Q. Well, where did you next see Mr. Johnson? A. When I left the store that evening. Q. Where did you see him? A. Out on Green Wood, at Spives's pool hall. Q. Where did you see him out there? A. At Spives's pool hall. Q. At Spives's pool hall? A. Yes, sir. Q. Monday evening, you say? A. Yes, sir. Q. Then what occurred? A. I was standing looking at the boys play pool, and he come to me and called me out to one corner of the building and asked me what I did with the whisky I stole, and I told him I didn't steal any. He says, 'You are a damn liar, you did.' I says, 'I did not.' He says, 'Who did you tell where this whisky was.' I says, 'I never said anything to nobody about the whisky.' He said, 'Did you see Miles?' I says, 'Yes.' He says, 'What did you say to him?' and he says, 'By God, that whisky was stolen, and nobody has stolen it but you,' and I told him I never; and he says, 'By God, I am going to find out who stole that whisky, and if you stole it I am going to kill you,' and I walked on out. I stands in there a few minutes, and I got scared and went on to my room. Q. Where did you see him next? A. The next time, coming around Green Wood, next in the center of the street, and he asked had I dug up that whisky yet; and I told him, 'No, sir; I did not have anthing to do with the whisky.' He says, 'Not any one knowed anything about it but you; you helped haul it out there;' and he says, 'If you don't go dig up, I am going to kill you.' I told him time and again I did not know anything about the whisky, and 'I ain't told nobody anything about the whisky.' So he quits me then, and he was on one side of the street and I goes onto the other side of the street. I was afraid to meet him then. I

keeps out of his way until that Sunday. I had been up to my room pretty much all day. Q. What did you stay in your room for? A. I was afraid to come out; afraid I would—might meet him and he would kill me like he said he would. Q. Then what occurred? A. I come on to supper, and after I eats supper I walks up to where the corner turns, and advances back toward Green Wood, and walks up to Second street, and goes on ·Second street to Archard, and meets Mr. Johnson with both hands in his pockets; and he says, 'Hello, Geronimo!' and I says, 'How do you do!' Two ladies passed us, and he says, 'Come here, I want to talk to you.' I walked up on the walkway and he walks up. So when I gets up there he pokes his hand in his pocket this way. He says, 'I want to get you to help me move some whisky—take off a load.' He said, 'I have been up here to get somebody to help me move it, but can't get any one who I can trust.' I told him I did not want anything more to do with helping haul whisky; I helped him once, and he accused me of stealing it. He says, 'I know you didn't steal that whisky; I have found out who stole that, and I made that all right.' So I still stood there. I did not say anything more to him. He says, 'Are you going to help me?' I says, 'No.' So he out with a gun and jobbed me in the side and cussed me, and says, 'Give me my money and you can have the whisky you stole.' I says, 'I ain't got no whisky.' He says, 'You are a damn liar, you have;' and says, 'Raise your hand.' So I had my foot up. So I did not have my hand up. I was afraid to move. So he goes through my pockets and searches and this watch pocket had twenty cents. He goes through my coat pocket, and goes through my other pockets, and puts his gun back in his pocket, and took my hat and searched it, and didn't find anything, and he takes his gun out of his pocket and still holds his gun on me. He walks around to me and says, 'Geronimo, you son of a bitch, if you don't go get that whisky I am going to kill you.' I says, 'Mr. Johnson I ain't got no whisky.' Q. Then what did he say? A. He says, 'You are a damn liar; if you don't go get it, I am going to kill you.' Q.

Then what was done? A. I turns on off from him and turns back Green Wood. So he held his gun pointed on me a distance of half block from me. Then he started to walking behind me. Q. Then what was said? A. I got up to the corner and he was still behind me. I walked on in a rush to Grant Freeman's and Grant Freeman was standing about middle of the place, standing this way, and he says, 'Hello, Geronimo, you seem to have—' Q. Now what did Johnson do; let's get back to Johnson? A. He still followed me on up there, and I goes back there to the back end, plum back to the back end, and was a paper back there, and I picked it up like I was reading and I was in there about three minutes, and in comes Mr. Johnson where Grant Freeman was standing there; then three ladies come in at the front door, and Grant Freeman walked away from Mr. Johnson to wait on the girls. Q. What did Mr. Johnson say? A. He comes back to me and says, 'You son of a bitch, haven't you dug up that money? If you don't want to get killed you had better dig it up.' I says, 'I told you the best I knew how I didn't have it; what more do you want?' He says, 'If you don't get the money I damn sure am going to get you.' And I walked out. He stayed in there, and walked on up to the front and got a cigar. Q. Then where did you see Mr. Johnson any more? A. I did not see him until the next night. Q. Where did you see him then? A. At the Diamond Drug Store. Q. How long had you been there before Mr. Johnson come in there? A. He was in there, I saw him after I got in there. I goes in and he and two men were leaning on the showcase. Q. What was Mr. Johnson doing, you say? A. I did not see him when I got in there, and when I saw him he was looking at me and I got scared right then. He told me he wanted to see me. He walks around and gets up here to me and I says, 'Mr. Joe, Mr. Miles in there?' He told me he was gone to the Metropolitan, to call him up see if could get him. So I walked two steps from him to the phone by the wall, and just picked up the phone, and he asked me, 'Did you bring the money with you?' And I told him,

'No.' He says, 'In hell I would be,' and turned his head this way where the two ladies were sitting there. He turned back to me and told me to go ahead and call Mr. Miles up, and some party answered the phone, and I asked if Mr. Miles was there. Q. Then what did Mr. Johnson say, if anything? A. I called up Miles and seen he was not there, and he told me— Q. You told Mr. Johnson that? A. I told Mr. Johnson he was not there; I was going to call up the house, may be at home, and he says he didn't give a damn—go call him up. I called the house, and some one answered the phone and told me that he was not there. He told me not to go to work and help nobody else haul any whisky and as soon as my back turned go steal it. I held the phone and didn't say anything back to him. So no one didn't answer and I had central to ring again. So no one didn't answer, and then I hung the receiver and set the phone up on the shelf. I told Mr. Joe no one answered the phone, and he says come on back here, Miles had paid my money, and I walked on back to where another showcase was. Q. Did you and he stop in front of the soda fountain? A. No, sir. Q. Where did you stop? A. Next to the showcase on the east side. The cigar case on the side out a foot or a foot and a half, and I was sitting next to the showcase with my back turned toward the front and he was standing in front of me. He says to me, 'Didn't I tell you last night if you didn't have the money the next time I saw you that I was going to kill you?' He says, 'Have you got it?' And he says, 'Well, if you don't hand up the money I am going to take a shotgun and shoot you in two with two loads of buckshots.' I says, 'Mr. Johnson, I ain't got no money and you want to kill me for it.' He says, 'Damn your soul and spirit, I am going to kill you just the same.' He says, 'By God, if you don't lay up the money, I am going to shoot you in two with buckshots;' and I told Mr. Johnson if I knowed he was going to do it—(interrupted). By the Court: Q. Where was this conversation? A. In the Diamond Drug Store. Q. Who was in there? A. Nobody but Mr. Grant Freeman and two ladies and two men

that walked up just as the first balls fired. Q. Then what did he do and say? A. He said, 'If you don't lay up that money, I am going to shoot you in two with two loads of buckshot.' Q. Well, did he do anything? A. Well, he still stood there talking to me, and I said, 'Mr. Johnson, if I had known you were determined to kill me, I would have stopped that last night and had you arrested.' Then he made a run there by me, and I run, and run into the showcase and it knocked me back. I got scared, and was running out of there, and grabbed my gun and commenced shooting. Q. Where was he at the time the shooting commenced? A. He was getting into the showcase; just partly against it. Q. How far was he from you? A. About five feet. Q. How far was he from that shotgun? A. About fifteen feet—fifteen feet. Q. And the shooting then commenced? A. Yes, sir. Q. After the shooting was over, what did you do? A. I was running out at the back door. Q. Did you run or walk? A. I run, peoples. Q. And you were arrested? A. Yes, sir. Q. And you have been under arrest ever since? A. Yes, sir. Q. Well, what condition of mind were you in? What effect did these threats Mr. Johnson had made have on your mind? A. Had me scared. By Mr. Evers. We object. By the Court: I believe he may answer. The jury will be the judge of the fact as to what effect it had upon the defendant's mind. He may state, if he wants to, what effect it had on his mind. By Mr. Elliott: Q. State to the jury whether or not you were scared? A. All the time from the time he took hold of me and said I stole his whisky and he was going to kill me if I didn't get it up. Q. What was the condition of your mind at the time of the shooting? A. I was scared of him. Next time he met me up there and told me if I did not pack in the whisky he was going to kill me. Next time he met me he put his gun in my belly and told me if I didn't get it he was going to kill me. Q. What effect did that have on your mind? A. And he told me the next time he seen me if I didn't have this money he was going to kill me."

It will be seen from the foregoing statement and synopsis of the evidence that the witnesses for the state establish the guilt of this defendant of the crime of murder. It is the opinion of the court that the testimony of the defendant does not make out a case of self-defense. From his own viewpoint there is no testimony that establishes any intention on the part of the deceased to kill the defendant or to inflict upon him any serious bodily harm at the time of the shooting. There is no showing of imminent danger to the defendant. The defendant's testimony only makes out a surmise that the deceased intended to get the shotgun and shoot him, although the evidence is clear that, at the time defendant fired the first shot into the body of the deceased, he was at least 15 or 20 feet from where the shotgun was located. It is also clear that the defendant could have retired and avoided the conflict (if the deceased had any intention of making a future assault upon defendant) with safety to himself. There is no dispute about the fact that six shots were fired by the defendant, and that all of the six took effect in the body of the deceased, one in his right side, and five in his back, and the physical facts in this case corroborate the statements of the state's witnesses to the effect that the deceased was staggering away from the defendant when he was shot from three to five times in the back, and at no time was making any effort to in any way inflict any injury upon the defendant. It is very evident that the jury considered that the killing of a bootlegger could amount to nothing more than manslaughter, however diabolical.

Numerous errors are assigned. Mostly certain matters which occurred during the trial of the case itself are presented as grounds for reversal. The alleged errors

are technical, but this court is frank to admit that certain things occurred during the trial of this case which should not have occurred; but the doctrine has been thoroughly established that where evidence on the part of the state makes out a case of cold-blooded murder, and under defendant's own testimony he is at least guilty of manslaughter in the first degree, and the conviction is only for manslaughter in the first degree, the judgment of conviction under such circumstances will not be set aside, although certain technical errors occurred during the trial, the defendant being deprived of no constitutional or statutory right. *Fitzsimmons v. State, ante,* p. 80, 166 Pac. 453, wherein it is said:

"It is a sufficient answer to the contentions made to say that we think, after a careful survey of the facts in evidence, that the testimony was susceptible of only two conclusions; that, taking the case as made by the state, it was a deliberate, cold-blooded, fiendish murder; and, taking the testimony of the defendant, he is, we think, guilty of manslaughter in the first degree upon his own statement. To hold that the testimony of the defendant and his witnesses established the defense of justifiable homicide would be to upset all well-settled rules and statutes, which point out the duty of one engaged in a quarrel, and the necessity of his avoiding the attack, if in his power, and, at most, to use only such force as was necessary to prevent injury to himself."

The Legislature of this state, by the enactment of section 6005, Rev. Laws 1910, has made it clear that the appellate courts of this state are not at liberty to set aside a judgment unless, "after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of constitutional or statutory

right." If there is any miscarriage of justice in this case, it was because the jury should have returned a verdict of guilty of murder instead of manslaughter.

It was not intended that the appellate courts should hunt through the numerous volumes of law books in the State Law Library to find technical reasons for reversing a conviction or to excuse the rulings and conduct of the trial judge in instances of this kind. The necessity of that has been done away with by the foregoing enactment of the Legislature, and it is the solemn intention of this court to respect that enactment. The trend of modern thought is to the effect that where the guilt of those charged with crime is established beyond the peradventure of a doubt, such as in this case, the criminal shall not escape his just punishment just because certain matters occurred and rulings were made by the trial judge during the progress of the trial that have heretofore been held to be technically erroneous.

It is not error alone that reverses judgments of conviction of crime in this state, but error plus injury, and the burden is upon the plaintiff in error to establish to this court the fact that he was prejudiced in his substantial rights by the commission of error; and how may it be said that this defendant was prejudiced by anything that occurred during the progress of the trial when, under his own testimony, he was at least guilty of the crime of which he was convicted? Under such circumstances, is it the duty of this court, although technical errors were committed, to remand the case for another trial, to subject the tax-paying public to the burden of again convicting this man, although, given the benefit of all reasonable doubt, he is guilty under his own statement of that crime

of which he was convicted? We do not so construe our statutory provisions. That was not the purpose of the Legislature, and it may as well be said at this time that where the evidence shows that the defendant killed the deceased, an unarmed man, by shooting him six times, once in the side and five times in the back, merely because he was afraid of him and apprehended that he might get a shotgun and shoot him, it. will be useless for him to appeal and ask a reversal of a manslaughter conviction upon technical grounds. This court. has not the time nor the disposition, nor do we believe it is its duty under the law, to reverse such a judgment unless fundamental error has occurred.

The judgment of conviction in this case is therefore affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.