### MIKE FABRY v. STATE.

No. A-3949.  Opinion Filed Feb. 17, 1923.
Rehearing Denied April 21, 1923.
(213 Pac. 910.)

(Syllabus.)

1. **Trial—Failure to Instruct on Law of Self-Defense not Error When not Requested nor Supported by Evidence.** Where no instruction on the law of self-defense was requested, and the issue of self-defense was not reasonably supported by the evidence, the failure of the trial court to instruct on that issue was not reversible error.

2. **Assault and Battery—Trial—"Dangerous Weapon" Defined—Failure of Court to Define Dangerous Weapon not Erroneous Where no Request Made.** A "dangerous weapon" is one "likely to produce death or great bodily injury by the use made of it." Where the undisputed evidence shows that the assault was made with a "sledge hammer handle" 2 1-2 feet long and 3 inches in circumference, inflicting injuries which disabled the prosecuting witness for 2 1-2 months, the appellant is not in position to complain of the failure of the trial judge to define the term "dangerous weapon," where no request was made to define that term.

3.    **Appeal and Error—Conviction—Sufficiency of Evidence.** Where, according to defendant's testimony, he is at least guilty of the offense for which he was convicted, none but fundamental errors will operate to reverse the judgment of · conviction.

4.    **Assault and Battery—Evidence Insufficient to Submit Issue of Simple Assault.** There was no evidence in this case requiring the submission of the issue of defendant's guilt of a simple assault.

Appeal from District Court, Pittsburg County; Harve L. Melton, Judge.

Mike Fabry was convicted of an assault with a dangerous weapon, and he appeals. Affirmed.

Moore & Harries, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

MATSON, P. J.  On the 8th day of April, 1920, the county attorney of Pittsburg county filed in the district court of said county an information charging:

"That Mike Fabry did, in Pittsburg county, and in the state of Oklahoma, on or about the 13th day of March, in the year of our Lord, one thousand nine hundred and twenty and anterior to the presentment hereof, then and there with a certain dangerous weapon, to wit, a certain pick handle or club which the said Mike Fabry in his hands then and there had and held in and upon one Tom Fabry, wrongfully, unlawfully, intentionally and feloniously make an assault by then and there striking and beating the said Tom. Fabry with the said pick handle or club aforesaid, with the unlawful and felonious intent then and there on the part of him the said Mike Fabry to then and there do great bodily harm to the said Tom. Fabry, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the state."

Thereafter defendant pleaded not guilty to such information, and on January 7, 1921, upon a trial to a jury, a verdict

of conviction was returned assessing his punishment at six months' imprisonment in the county jail. Thereafter motion for a new trial was filed and overruled, and the defendant duly sentenced in accordance with the verdict.

The errors assigned and relied upon are as follows: (1) The defendant was entitled to have instructions covering the law of self-defense submitted to the jury. (2) Instruction No. 3 given by the court in the general charge is erroneous because (a) it excludes the plea of self-defense. (b) It invades the province of the jury, in that it states as a matter of law that "a pick or sledge hammer handle" is a "sharp or dangerous weapon." (3) The court erred in failing to submit to the jury the issue of simple assault.

As to the first alleged error above assigned, the following may be said: The defendant was charged with having assaulted his brother, Tom Fabry, by striking him with a pick or sledge hammer handle, and the evidence shows that this club was about 2 1-2 feet long and 3 inches in circumference. The prosecuting witness and three other witnesses for the state who were present at the time of the assault all testified that the defendant struck the prosecuting witness over the head and shoulder, knocking him to the ground, and then continued the assault by striking the prosecuting witness with the club after the prosecuting witness had fallen to the ground, inflicting such severe injuries upon the prosecuting witness that he was totally disabled to follow his occupation of coal mining for a period of 2 1-2 months; that at the time the defendant first struck the prosecuting witness the prosecuting witness was standing talking to other persons and made no attempt to strike or in any way injure the defendant. In other words, that the assault by the defendant at the time was entirely unprovoked, either by words or gestures.

The testimony of the defendant is unsupported by that of any other eyewitness to the transaction. Defendant's testimony does not make out a case of self-defense in any particular, as is shown by the following excerpts from his testimony:

"Q. Just what conversation you and Tom had, what you and Tom talked about just before this trouble? A. Well, we was—this thing been on 13th of March and Saturday, I don't remember if it was after noon or before noon. Q. Somewhere near noon? A. I believe it was about 11 o'clock; I could not for sure about that. Q. Tell the court and jury what you and Tom were talking about just prior to this difficulty? A. I went office, and they didn't have my pay ready yet, and I wait a little, and I take my pay and put in my pocket and was walking around over there and went to the store and just looking over there, and I was buying this pick handle—no; a sledge hammer handle to put in there. I was working in twenty-two buck at that time. I was doing anything around the mine. Q. What did you want with the sledge hammer handle? A. I was going to cut it off and put him in a hatchet. I was fixing telephone wires, anything around the mine. Q. What was said between you and Tom? A. Well, after I buy this handle, I was outside the store walking around, and he come out of the store. He start to talk to me about it, and I says, 'Ain't you going get killed?' He called me 'robber,' one thing and 'nother; he says, 'You are like your brother John and Andrew.' I says, 'Don't call me robber, you call me enough of it,' and at that time when he call me robber I struck him. He says, 'You get killed, you God damn robber son of bitch;' that is, he was coming up, and I says, 'Who kill that way?' So he start to put his hand in his pocket, and that time I struck him same time right over the side because I know he ready to kill me because he carried a gun with him, .32 automatic, and I know he had it all the time and he want to kill me brother John and Andrew and me, too, and he told me the same day he was going to kill me, and that is the reason I struck him. Q. Why did you think he had the .32 in

his pocket? A. I saw it; you could see handle right here (indicating) in his pocket. I could see it and I tell my brother John, if he was here he could say same thing. I says you better be careful in the office—

"The County Attorney: Object to anything he told his brother John.

"The Court: Objection sustained. A. And he call me robber and dirty son of bitch, and I just struck him over the side. Q. Did you try to kill him? A. No; I don't try to kill him, I try to give him pretty good whipping, pretty good whipping for my mother grave, and you rob that money, $250, I believe it was, I have the letter and same time too you say you try to kill me anyhow, but I am not going to kill you, but I give you pretty fair whipping, I told him. Q. You say at that time you saw the pistol in his pocket? A. Yes, sir; that is the reason I hit him, I could hit him with the fist, but that is the reason I hit him with the sledge hammer handle, I saw this pistol and I know he going to pull him out if I didn't hit him, and that is the reason I hit him with the hammer handle, I was afraid he was going to pull it out and kill me."

And again on cross-examination:

"Q. You thought he was a robber, didn't you? You thought he had robbed your mother's grave and you told him that? A. I says, 'You are robber.' Q. You told him he was the robber? A. I told him he was robber, I says, 'You are robber; you rob mother's grave $250.' Q. I want you to answer my questions in a few words, how long have you had it in for Tom? A. I ain't got it in; my brother was over here to tell me about that mother tombstone. Q. You can't get away from mother's grave? A. I can't get away, because that is the thing coming up to; that is the reason I whipped him, mother's grave. I ask about letter at the same time, and about the same time, when he call me robber, I hit him. Q. Tell me in just a few words, why did you strike Tom Fabry? A. I struck him right at the coal office. Q. What did you do it for? A. I hit him when he call me robber."

And again:

"Q. The first word you said after you struck that man, you struck him once and Mr. Allbritton tried to catch you and said, 'Mike, what are you trying to do.' You never said a word; you whirled and hit your brother, his laying on the ground, you never said a word, you started to strike him again, and he caught at you again and you dodged him and struck your brother across the arm, and he tried to catch you again when you went to strike at him, and you whaled away with that there handle and struck him laying mercilessly on the ground a third time, and struck him across the leg and it was then and there that he caught you and crowded you away and you went off a few steps and held that handle up and said, 'Now, who is a God damned son of a bitch?' That happened didn't it? A. No, sir. Q. Then that is not true then? A. No, well one thing—Q. I don't want to know one thing.

"Mr. Keith: Your honor, he wants to make an explanation.

"The Court: Tell what was true? A. The only thing I hit him, Mr. Allbritton run to me. 'Don't hit him any more,' he says, 'Please don't hit him,' he says, 'Please don't kill him.' I says, 'I don't want to kill him, I just give him for what he call me robber for and he rob my mother's tombstone, I just give it to him.' Q. You struck him because he hadn't put that tombstone to your mother's grave in Europe? A. Man like that—Q. Just answer my question, did you—that was why you struck him, wasn't it?

"Mr. Keith: Your honor, I object to that.

"The Court: Let him answer first why.

"Q. That is why you struck him, because he hadn't put the tombstone to your mother's grave? A. No, sir; I had excuse him about that mother tombstone if he not talk to me and want to call me robber and dirty son of bitch, at that time I struck him. Q. You never did intend to excuse him did you? A. I be here thirteen years, but he called me robber

and everything there. Q. You didn't want to be called a robber, did you? A. No, sir.''

No instruction covering the law of self-defense was requested by the defendant, and we think it clear from what has heretofore been said concerning the testimony of the state's witnesses and from the excerpts taken from the defendant's testimony, that the issue of self-defense was not reasonably presented by the evidence. It was not error, therefore, for the trial court to fail to instruct upon this issue in this case. Smith et al. v. State, 22 Okla. Cr. 383, 212 Pac. 1012.

What is said above concerning first assignment of error is applicable with equal force to subdivision (a) of the second assignment of error. Subdivision (b) of the second assignment of error relates to the failure of the trial court to submit to the jury the question of whether or not a pick handle or sledge hammer handle, which the evidence showed to be 2 1-2 feet long and 3 inches in circumference, was or was not a "dangerous weapon" within the statutory meaning of that term. No request was made of the trial court to define the meaning of the term "dangerous weapon." A "dangerous weapon" has been defined by this court to be one "likely to produce death or great bodily injury by the use made of it." Bourbonnais v. State, 7 Okla. Cr. 717, 122 Pac. 1131.

The evidence in this case clearly established that this pick handle or sledge hammer handle, as used by the defendant in making the assault upon his brother, was, in fact, a "dangerous weapon" as above defined. There was no controversy in the issues joined on that subject. Had it been a controverted issue of fact and had the trial court failed or refused to define a "dangerous weapon," then there might be some merit in this assignment of error, but under the state of this record and in view of the provisions of section 2822, Compiled Statu-

tes 1921, this court is not authorized to reverse this judgment because of such alleged error.

In this case the defense interposed amounted virtually to a plea of guilty. According to the defendant's own testimony, this assault was entirely uncalled for and was occasioned because the prosecuting witness applied certain opprobrious epithets to the defendant immediately preceding the assault.

In the case of Harris v. State, 14 Okla. Cr. 489, 173 Pac. 958, this court took occasion to say:

"It was not intended that the appellate courts should hunt through the numerous volumes of law books in the State Law Library to find technical reasons for reversing a conviction or to excuse the rulings and conduct of the trial judge in instances of this kind. The necessity of that has been done away with by the foregoing enactment of the Legislature, and it is the solemn intention of this court to respect that enactment. The trend of modern thought is to the effect that, where the guilt of those charged with crime is established beyond the peradventure of a doubt, such as in this case, the criminal shall not escape his just punishment just because certain matters occurred and rulings were made by the trial judge during the progress of the trial that have heretofore been held to be technically erroneous. It is not error alone that reverses judgments of conviction of crime in this state, but error plus injury, and the burden is upon the plaintiff in error to establish to this court the fact that he was prejudiced in his substantial rights by the commission of error, and how may it be said that this defendant was prejudiced by anything that occurred during the progress of the trial when, under his own testimony, he was at least guilty of the crime of which he was convicted? Under such circumstances, is it the duty of this court, although technical errors were committed, to remand the case for another trial, to subject the taxpaying public to the burden of again convicting this man, although, given the benefit of all reasonable doubt, he is guilty under his own statement of that crime of which he was convicted? We do not so construe our statutory provisions."

There was no evidence in this case requiring the submission of the issue of simple assault. That there was no fatal variance between the allegations of the information and the proof adduced, see the opinion of this court in Cotton v. State, 22 Okla. Cr. 252, 210 Pac. 739.

Counsel representing defendant in this court were not connected with the trial of the case in the lower court.

The judgment is affirmed.

DOYLE and BESSEY, JJ., concur.