Jerry Clyde BEELER, Plaintiff in Error,

v.

**STATE of Oklahoma, Defendant in Error.**

**No. A–12604.**

Criminal Court of Appeals of Oklahoma.

Jan. 21, 1959.

Rehearing Denied March 11, 1959.

Roy H. Semtner, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Jerry Clyde Beeler, hereinafter referred to as the defendant, was charged by information in the District Court of Oklahoma County with the crime of assault with intent to kill. He was tried before a jury, found guilty, and his punishment assessed at 10 years in the Oklahoma State Penitentiary. He was charged jointly with one Marsha Gilson. A severance was granted and defendants tried separately.

The transcript of the testimony reveals a set of facts almost inconceivable to the human mind. The sordid mess out of which this case arose would shock the average viewer and compel the most sensible person to analyze it as fiction. However, the evidence is sufficient to support the jury's finding that it did happen. The evidence by witness Heath reveals a number of hours of maddening fright, brutality, suffering, and horror on the part of the prosecuting witness at the hands of the defendant and his co-defendant. The prosecuting witness Heath represented herself as a waitress by occupation who lived in Grand Prairie, Texas. That she

came to Oklahoma City on a visit and was staying at a motel in Moore, Oklahoma. That while here she made contact with an old friend, Marsha Gilson, who, according to the testimony, was a prostitute living with the defendant. Witness Heath was invited by Marsha Gilson to come to the residence of the defendant where she did go on December 28, 1956. She visited with her friend, Marsha, and met the defendant, Jerry Beeler. While there she was invited to check out of the motel where she was staying and she agreed to spend the night. Prosecuting witness checked out of the motel and returned to the home of Jerry Beeler and Marsha Gilson. The evidence reveals that considerable drinking took place between Jerry Beeler and Marsha Gilson and witness Heath, contrary to Beeler's testimony, who denies participating in the drinking spree.

While there she related to Gilson and Beeler that she had sold some property in Texas and as a result was expecting $500 to be wired her. Witness Heath and Gilson proceeded to the Western Union Office and received the check, cashed same, and returned to the home of the defendant. Witness Heath also testified she had brought $200 additional money with her to Oklahoma City, making a total of $700 in her possession. Saturday night defendant and his girl friend invited the witness Heath to accompany them to a tavern or night spot, known as "Big Corner", but because of the defendant's drinking, witness refused to go. They insisted and witness Heath continued to assure them she was not going with them. They cursed her considerably and she told them she would leave and return to the motel. A bootlegger who had previously delivered whiskey was called and prosecuting witness informed him she was afraid her life was in danger and would he help her get her things into her car. The bootlegger replied, "I don't want to have any trouble with Jerry because he is dangerous and I don't want him mad at me."

Beeler came to the door and witness Heath asked him if he cared if the bootlegger helped load her suitcases in the car and Beeler, the defendant, nodded his head affirmatively. The suitcases were loaded in her car and the bootlegger disappeared. She returned to the house to get a plastic zipper bag containing clothing. Marsha Gilson told the defendant, "Don't let her take my clothes out of here." Witness Heath informed the defendant the clothes were hers, but at the request of defendant left the clothes, telling Marsha she would return tomorrow and get the rest of her things. She returned to the car to leave. Marsha Gilson then started out and yelled to Beeler, "She said she was going to have me arrested. Don't let her get away and besides, she has that $700.00 on her." Defendant then ran out, jerked the witness Heath from the car and began whipping the defendant with a chain which was wrapped around defendant's hand. The chain was described by the prosecuting witness as similar to a trace chain. "He hit me the first time—he hit me in the eye, but the second time he hit me in the mouth and knocked my teeth out." She also testified her glasses were broken in two. She testified the second blow rendered her unconscious. That while she was on the ground defendant was kicking her saying, "Get up, you are not knocked out; there's nothing wrong with you." That defendant kicked her all over the body, and shoved and pushed her. She was dragged and carried back into the house and she came to with defendant standing over her still beating her about the face and head with both hands; in one of which was the chain. While on the divan Marsha Gilson hit her twice on the head with a ½" iron pipe about 12" long. Prosecuting witness stated when she came to later on, the pillow upon which she was laying was blood stained. Defendant took the $700 from her brassiere, and Marsha Gilson grabbed it from the defendant and said, "I've got the money and I'm going to burn it up." A fire was started but witness refused to look, saying, "I just

couldn't stand to see $700.00, all the cash I had, burned up." The defendant and Marsha Gilson then took her back to a bedroom, knocked her down on the bed and Marsha again hit her on the head with the pipe and defendant chained her to the bed. That later in the night defendant and Marsha came into the room; both were in the nude, and defendant took his private and rubbed it over the face of witness Heath. The next morning at her request she was released by the defendant to visit the bath room and look for a broken dental bridge. She was returned to the bedroom and again chained to the bed. While looking for the bridge she got a purse from her car which contained a small screw driver. That Sunday she could hear visitors and indication of continued drinking. That defendant and Marsha would come back ever so often and check on her, would curse her and threaten to take her life, stating once that he was going to kill her, wrap the chain around her, and drown her, and on one occasion said he would drive her car into the lake and it wouldn't ever be found and no one would ever know.

Sunday evening the two reappeared in the bedroom and informed her that they were going out to make some money. Witness begged them not to leave her alone; that she was afraid to stay there chained to the bed alone. After bringing a dog in the bedroom with her, the defendant and Marsha left at approximately 10:00 p. m. Sunday night. While they were gone witness managed to pry open a chain link with the aid of the iron pipe and the screw driver. She released herself from the bed to which she had been shackled and called the police. The police arrived. According to Officer Higginbotham, witness Heath's face was swollen and bruised and blood was on her. She still had the chain around her wrist. Officer Higginbotham cut the chain with a pair of pliers and removed it from her wrist. Her eyes were nearly swollen shut. Officers also found a piece of pipe as was described by the witness; also the screw

driver. She was taken to the hospital by Officer Potts. Officers waited for the arrival of Beeler and Gilson. Upon their arrival, they were shaken down and a 10 guage shotgun was found in the car. Defendant was placed under arrest. Defendant admitted to the officers that he beat her up and chained her to the bed. On direct examination the defendant denied hitting the witness Heath with the chain, but said he used his fist in repelling an attack of witness Heath with a pen knife. After witness Heath was taken to the hospital, she was attended by Dr. J. R. Stacy, who testified that when he first saw her on January 1, 1957, she was covered with bruises and swelling over her head, neck, chest, and left lower extremities, and gave him a history of having been beaten with a chain. Photographs taken as she left the hospital substantiated the doctor's testimony. The defendant denied using anything but his hands and contended the altercation arose by fault of the prosecuting witness in trying to get Marsha Gilson to leave with her.

The charging part of the information upon which the defendant was tried read as follows:

"That is to say, the said defendants, acting conjointly and together, in the county and state aforesaid, and on the day and year aforesaid, then and there wilfully, unlawfully and feloniously, and without justifiable or excusable cause, make an assault and battery at and upon one Virginia Heath, with certain dangerous and deadly weapons, to-wit: link of chain and small piece of pipe, a more full and correct description of which is to your informant unknown, had and held in the hands of the said defendants, by beating the said Virginia Heath upon the head and face with the aforesaid weapons, as above described; contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma."

The defendant lodged his appeal in this court and advanced three assignments of error upon which he relies for reversal or modification. Said assignments of error being advanced in the following manner:

"1. The trial court committed error in not submitting to the jury the issue under section 653, Title 21 OSA.

"2. The trial court committed error in not submitting to the jury the question of whether or not the 'link of chain' or 'chain' alleged to have been used by the defendant in the assault was a 'deadly weapon.'

"3. That the punishment assessed by the trial court is unreasonable, unjust and excessive."

In considering defendant's first proposition, the court cannot ignore the numerous decisions of this court which support the long established rule that where counsel for the defense are of the opinion that additional instructions should be given, it is their duty to reduce them to writing, submit them to the trial judge and request that they be given. See Gaddy v. State, 81 Okl.Cr. 236, 162 P.2d 787; Walker v. State, 92 Okl.Cr. 256, 222 P.2d 763. We have carefully examined the record and find no objections were made nor exceptions taken to the instructions, nor was there a single request for an instruction to be given. The only exception to this rule will be found wherein the defendant was deprived of some substantial right by the trial court's failure to instruct upon some material issue of the case, suggested by the evidence. We do not find this to be the case in the instant cause. The failure of the court to instruct the jury under Title 21 O.S.A. § 653 in absence of a request had little bearing upon the verdict rendered and this court fails to see where it deprived defendant of any substantial right. The information was drawn upon the alleged offense as outlined in Title 21 O.S.A. § 652 which reads as follows:

"652. Every person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of firearm, airgun or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death or in any manner attempts to kill another, or in resisting the execution of any legal process, is punishable by imprisonment in the penitentiary not exceeding twenty (20) years."

Section 653 provides:

"653. Every person who is guilty of an assault with intent to kill any person the punishment for which is not prescribed by the foregoing section, is punishable by imprisonment in the penitentiary for a term not exceeding five years, or in a county jail not exceeding one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment."

It has been held by this court that the means prescribed by which the offense may be committed are in substance the same, and the material difference arises only in the punishment prescribed. In the first, punishment must be by imprisonment in the penitentiary with 20 years maximum; in the second (§ 653) the maximum is five years and the punishment may be as a misdemeanor, by a fine not exceeding $500. In the first, the essential element is an assault and battery by means of a deadly weapon with intent to kill; in the second, the assault must be with intent to kill. See De Witt v. State, 58 Okl.Cr. 261, 52 P.2d 88; also Clemmons v. State, 8 Okl.Cr. 452, 128 P. 739. The complaint is based on the fact that the jury could have given a lesser punishment had the court instructed on the law as prescribed in Sec. 653. However, it is to be noted that the jury was given this opportunity by the court's instruction on numerous lesser offenses. The instructions have been

carefully reviewed and we find that the court instructed the jury on the offense of assault with a dangerous weapon with intent to kill, under Sec. 652, carrying a maximum penalty of 20 years imprisonment; also on the offense "Assault with dangerous weapon," Title 21, § 645, carrying a penalty of imprisonment from one year in the county jail to five years in the penitentiary; also, on the offense of aggravated assault, under Title 21, § 647, which provides a penalty of not to exceed one year in the county jail or by a fine of $500 or by both such fine and imprisonment; also, instructed the jury on the offense of assault and battery, Title 21, § 644, which prescribes a punishment of not exceeding 30 days in the county jail, or by a fine of not less than $5 nor more than $100 or by both such fine and imprisonment.

The jury had they been so inclined could have, under the instructions, found the defendant guilty of any one of several lesser offenses, but evidently they did not feel justified in so doing and found the defendant guilty of the greater offense and assessed his punishment at one half of the maximum.

This court would employ weird reasoning to assume the defendant had been deprived of any substantial right by the failure of the trial judge to instruct upon another lesser offense as is provided by Sec. 653. We find no merit to defendant's contention in this regard.

Defendant's second assignment of error complains of the court's failure to submit to the jury the question of whether or not the "link of chain" or chain alleged to have been used by defendant was a "deadly weapon."

That portion of instruction No. 2 from which this assignment of error arose read as follows:

"* * * If, after a careful consideration of the evidence in this case you should find beyond a reasonable doubt that said defendant, Jerry Clyde Beeler, at the time and place alleged in the information did commit the offense of Assault with Intent to Kill, upon the complaining witness, Virginia Heath *with a certain link of chain or piece of pipe which was a deadly weapon, and as charged in the information,* then it will be your duty to convict the defendant on trial of the offense of Assault with Intent to Kill and fix his punishment at imprisonment in the State Penitentiary for a term not exceeding 20 years."

The issue about which the defendant complains is stated in his brief in the following language:

"The only portion of the court's instructions which in any manner touched upon the question of whether or not the 'link of chain' or 'chain' was a *deadly weapon* is contained in the second paragraph of instruction number two. (p. 8) * * * We feel that the use of the word 'which' between the words 'pipe' and 'was' changes the meaning of the entire instruction from one in which the jury might have been told to find whether or not as a matter of fact the 'link of chain' was a deadly weapon into an instruction in which the court instructed the jury as a matter of law that the 'link of chain' was in fact a deadly weapon."

It is again to be noted that the record reveals no objection was made to this instruction nor was there an exception taken. This court said in the case of Green v. State, 70 Okl.Cr. 228, 105 P.2d 795:

"Where no objection is taken to instructions of trial court, such instructions will not be examined by Criminal Court of Appeals for purpose of discovering other than fundamental error."

This court passed squarely upon this question in the case of Fabry v. State, 23 Okl. Cr. 215, 213 P. 910.

Though we are convinced defendant waived his right to raise this question on appeal, it is a matter that should be

clarified. The necessity for this discussion is motivated by the ever growing change in the purpose for which a trace chain was designed.

In times gone by a trace chain was only thought of as an accessory by which a man with the assistance of an animal could till the soil, pull a load, or transport his wares. As then known, it would have been preposterous to assume that such a chain was designed as an instrumentality of death or a weapon of defense or attack. However, this court takes judicial knowledge of the fact that as the trace chain gradually vanishes as an instrument of industrial pursuit, its use as a weapon of sadistic brutality has grown in malignant proportions. Chain beatings have become a common, brutal and unmerciful past time of juvenile gangs and adults deriving pleasure from the pain and suffering of others. A review of the decision from this court and other jurisdictions have considered weapons of assault in two classes: First, those which are as a matter of law "dangerous or deadly weapons" and, Second, those which are not dangerous or deadly weapons to others in ordinary use for which they are designed, but may be established as such depending on the manner of use and intention of the possessor. A weapon is broadly defined as anything used or designed to be used in destroying, defeating, or injuring an enemy —an instrument of offensive or defensive combat. 56 Am.Jur. § 2, page 991. The difficult question presented is in the determination as to whether a weapon is a "dangerous or deadly one." The courts are usually governed by the statute prohibiting the carrying of concealed weapons. In this state, Tit. 21 O.S.A. § 1271 lists the weapons that our courts have considered as dangerous or deadly weapons per se. The statute which is in many respects antiquated or obsolete reads as follows:

"It shall be unlawful for any person in the State of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword-cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense * * *".

This statute obviously enumerates those weapons which are dangerous and deadly per se, by virtue of being an instrument which, when used in the ordinary manner contemplated by its design and construction, will or is likely to cause death or great bodily harm. See Cooke v. State, 53 Okl. Cr. 348, 351, 12 P.2d 244.

Some weapons, under particular circumstances, are so clearly lethal that the court may declare them to be such as a matter of law. Of this class are the weapons falling within the category of Title 21 O.S.A. § 1271, supra; all others are lethal or not, according to their capability to produce death or great bodily harm in the manner in which they are used, and the jury must be the judge. It is a question of fact, the determination of which properly belongs to them. See State v. Godfrey, 17 Or. 300, 20 P. 625. For instance, it is a matter of common knowledge that a "plank" can be used as a weapon of offense or defense in numerous ways without inflicting serious bodily injury or intending to inflict injury. A plank can also be used in a manner calculated to produce death or great bodily harm. A plank is not a dangerous or deadly weapon per se. Whether or not the plank used was of such character, and used in a manner reasonably calculated to cause serious bodily injury is a question of fact for the jury. See Moody v. State, 11 Okl. Cr. 471, 475, 148 P. 1055, and the jury should be so instructed and a failure to grant such a requested instruction would constitute reversible error. This court has held that a fist is not a dangerous weapon per se, Bean v. State, 77 Okl.Cr. 73, 138 P.2d 563, but when metal knuckles are used in inflicting blows with the fist, the knuckles are per se a dangerous weapon. Armstrong v. State, 51 Okl.Cr. 407, 2 P.2d 100. In the instant case the testimony relates that the defendant wrapped a chain like a trace chain around his hand and proceeded to beat the prosecuting witness. The most

liberal interpretation to be placed upon defendant's complaint is that the court in effect instructed the jury that such a weapon as a matter of law constitutes a dangerous and deadly weapon. Defendant's complaint arises from the fact that this court has not heretofore adjudged a chain to be a deadly weapon per se, nor is a chain enumerated in our statute prohibiting the carrying of weapons, and therefore the instruction complained of is fatally erroneous for treating it as such. The courts have followed the general pattern of measuring the dangerous weapon by the yardstick of its designer. However, to say that a gun, dirk, sword, billie club, slingshot, knucks, etc., are dangerous weapons per se because they were designed to maim and kill, yet to say the chain is not because it was originally an instrumentality of man with which to perform labor would be to ignore the common use to which the chain is now put as a weapon of combat. This author is convinced that the trial courts are capable and justified in applying such a rule and determining when an instrument by its widespread use or measure has become a dangerous weapon as a matter of law, regardless of the beneficial purpose for which it was originally designed. It would be an abasement of reason to say that a piece of trace chain wrapped around the hand of an attacker would be less dangerous than a pair of knucks. It would require distorted reasoning to say a motorcycle chain with a hand hold provided or a piece of trace chain or its equivalent in the hand of one bent on inflicting serious bodily injury to be less dangerous than a billy club or black jack. Certainly to the victim of such an assault, each is a dangerous and deadly weapon as far as the dangerous or deadly results are concerned.

 The legislature in devising the statute prohibiting the carrying of weapons surely did not intend to restrict the definition of knucks or billy club to those which are store bought, but to those also which may by common usuage fall in the same category. The better test which logical reasoning dictates is directed at the heart of the question before us and is two-fold: Can the instrumentality be used to injure or kill, and has it been so used sufficiently to set a pattern of criminal conduct, a pattern so definite that for the better protection of society the courts must take cognizance.

 In the face of earlier decisions of this court holding that a. chain is not a dangerous weapon per se, this court is compelled to take judicial knowledge of the evergrowing use of the chain as an instrumentality of combat. This court recognizes that the heart and sinew of justice is that quality of flexibility which enables it to throw an ever-widening mantle of protection around the individual, as well as to lend support to the implement in the hands of those with whom the people entrust the enforcement of our criminal law. This court feels that the trial judge may declare a weapon to be a dangerous weapon per se if the weapon used appears to have been designed as a weapon of combat and is capable by its description or appearance of producing death or serious bodily injury. This court feels that no distinction can be drawn between a pair of metal knucks and a piece of trace chain wrapped around an attacker's fist and the court was justified in declaring it a dangerous or deadly weapon per se.

 Defendant's third assignment of error complains of the punishment as being excessive. No doubt the jury was in a much better position to assess the punishment than the Criminal Court of Appeals. They heard and had occasion to observe the witness and the testimony of the prosecuting witness which, if believed by the jury, justified their verdict.

From a careful examination of the issues in this case, we find no justification for reversal or modification.

POWELL, P. J., and BRETT, J., concur.