## JAMES P. FITZSIMMONS · v. STATE.

No. A-2659.    Opinion Filed July 18, 1917.

Rehearing Denied October 2, 1917.

(166 Pac. 453.)

1.  **EVIDENCE—Testimony on Preliminary Examination.** ˙ In a prosecution for murder, where the testimony of a witness was given at the preliminary examination, and his testimony was taken by the reporter, in the presence of the defendant and his counsel, who cross-examined him, and such testimony is transcribed and filed with the court clerk, **held,** that if the witness is not present at the final trial, and the state shows that such witness cannot with due diligence be found within the jurisdiction of the court, the testimony of the witness may be read to the jury; and **held**, further, that it is immaterial that the names of the witnesses used by the state to prove that defendant had been confronted by the witness, and that the witness was then beyond the jurisdiction of the court, were not indorsed upon the information.

2.  **APPEAL AND ERROR—Trial—Instructions—Requests.** Where a party desires the court to give any particular instruction, or desires that the one that is given be made more specific or comprehensive, it is the duty of counsel to prepare and present to the court such desired instruction and request that it be given, and in the absence of such request a conviction will not be reversed, unless this court is of the opinion, in the light of the entire record, including the instructions given, that the defendant may have been prejudiced by the instruction complained of.

3.  **SAME—New Trial—Instructions.** Where a verdict is clearly sustained by the evidence, a new trial will not be granted for slight inaccuracies in the instructions.

*Appeal from District Court, Payne County;*
*A. H. Huston, Judge.*

James P. Fitzsimmons was convicted of manslaughter in the first degree, and appeals. ‚Affirmed.

*John P. Hickam* and *Vaught & Brewer,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

DOYLE, P. J. Plaintiff in error, herein referred to as the defendant, was convicted of manslaughter in the first degree on an information filed in the district court of Payne county on the 19th day of April, 1915, charging him with the murder of Jack Corrigan, in said county on the 23d day of March, 1915. In accordance with the verdict of the jury rendered October 15, 1915, he was sentenced to serve a term of five years' imprisonment in the state penitentiary. To reverse the judgment the defendant appealed, by filing in this court on February 28, 1916, a petition in error with case-made.

In order to better understand the errors assigned, the following brief statement of the facts disclosed by the testimony is made; also extracts from the testimony of the witnesses and of the defendant as a witness in his own behalf:

It appears from the evidence that the killing occurred at a road house known as the Line House, situated on the road between Cushing and Drumright. The record shows that the testimony of J. W. Barrett and J. R. Long, as given upon the defendant's preliminary examination, was relied upon by the state to show the circumstances of the killing. The testimony of J. W. Barrett, as read from the transcript by the reporter who took the same, was in substance as follows: That on the date alleged in the information he left Drumright, where he lived at that time, with J. R. Long, and went to the Line House, just across the line in Payne county, about two miles west of Drumright; that they arrived there about 4 o'clock; that he knows the defendant, Fitzsimmons, and saw him when

he came into the road house; that at that time Jack Corrigan, the deceased, was standing with his back to the bar and with his elbows on the bar; that when the defendant came in he had a pistol in his hand, and he walked up to the deceased and shot him; that he never saw Jack Corrigan before; that there were six or seven people in the room when the shot was fired; that J. R. Long and J. P. King and a woman called Billie Reed were present at the time; that the deceased sank to the floor, and J. R. Long called for a glass of water and a pillow; that the defendant then made the remark, "If any of his friends wanted any of it, they could get it"; that he later saw the body of the deceased at the undertaker's, and noticed that the bullet entered below the collar bone and passed out near the small of the back; that it was between 4 and 5 o'clock when the shooting occurred; that he left the room and saw the defendant coming out with Billie Reed, and he then went back in; then Billie Reed came back and threw herself on the body. His cross-examination by Mr. Hickam, counsel for the defendant, was in part as follows:

"Q. Where were you standing in this room at the time the defendant came in? A. I was standing at the north end of the bar; the door comes in from the north. Q. Does the building extend north and south? A. Yes sir. Q. This counter runs what direction? A. North and south. Q. This is in what side of the house? A. North. Q. How many windows in this building? A. One north and one west. Q. Where is the window as to this counter? A. The window is near the end of the counter, where the man was shot. There may be more, but this one window is there, because the bullet went through the blind of the window and broke the top sash out of the window. Q. Where were you standing? A. Right at the door. Q. Where was Corrigan standing? A. He was standing at the opposite end of the counter. Q. Did

you know Corrigan before this time? A. No, sir. Q. What was the first thing said when the defendant came in? A. I didn't hear anything said before the shooting. Q. When the defendant came·in, where were you as to the defendant? A. I was standing right at the end of the bar, and stood there until after the shooting. Q. Where was the defendant standing? A. He walked down the counter within four feet of the man that was shot."

The testimony of J. R. Long is substantially as folfows: That he had lived at.Drumright about 18 months; was a rig builder; took the witness Barrett and his child to the Line House that afternoon in his automobile; was in the room when the defendant came in and shot Jack Corrigan, who was commonly called "Happy Jack." The defendant came in with Billie Reed, and was holding her by the arm, and she was crying when they entered the door. "Happy Jack" was standing at the bar; the defendant pushed the girl aside and shot him. The man that was shot said nothing. "He just sank down," and witness caught him in his arms and called for water and for something to put under his head. Immediately after shooting Corrigan the defendant said, "If you fellows are friends of this man, and want any of it, you can get it," and then said to, the deceased, "Get up and fight, you son of a bitch, like a man!" The deceased did not have anything in his hands at the time he was shot. His cross-examination by Mr. Hickam was in part as follows:

"Q. Were you ever convicted of any crime? A. I never was. Q. You came to this Line House at what time? A. About 4 o'clock. Q. How long were you in this house? A. All together about ten minutes. Q. What part of this building is the counter in? A. Northwest. Q. When the defendant came at the north door where did he go? A. Walked right through. Q. Did he say

anything? A. Not that I heard. Q. What did the deceased say? A. Didn't say anything that I heard. Q. How far were you standing from the deceased? A. Right beside him. Q. How far from the defendant. A. Five or six feet."

Roy McClerken, as a witness for the defendant, testified that he knew Jack Corrigan, known as "Happy Jack," for more than a year; that on the day he was shot he went with Oscar Hendricks from Drumright to the Line House; that they arrived there a little after 4 o'clock, and found "Happy Jack" there, and they had a few drinks together. He further testified as follows:

"Q. Did you see this defendant that afternoon? A. We were out there about an hour. I and this boy went out there in a livery car, went out there to get a drink, and this livery man went back to Drumright, and during this time we concluded to go to Cushing. I guess we had been there maybe half or three-quarters of an hour, I would not say how long, and Mr. Fitzsimmons drove up, and I hallooed at him. I knew him. I used to ride with him, and I asked him if he had a load in town. He stopped and said, 'No, he had room for another one or two;' and I said, 'If you wait a few minutes I will go with you; I have another boy with me.' So he got out and came in, and this fellow with him, named Chris Glacken. When they came in, this 'Happy Jack' spoke up and said, 'There is that G——damn son of a bitch that would not sign my bond.' That Fitzsimmons walked in and walked past us. We were standing at the bar, and this guy turned around and looked at him and made this remark. 'Happy Jack' made this remark. Jack he picked up something, I don't know what it was, looked like a piece of iron or chisel, and started towards Fitzsimmons, and Fitzsimmons said, 'Stop, Happy; better stop.' Said that about three times. Happy, when he got over close to him, pulled this iron. Q. Did Fitzsimmons move? A. He backed off, clean as far as—well

he couldn't get out, he was against the wall; Happy pulled this iron back and hit up on Fitzsimmons, and Fitzsimmons shot him. Q. What did the defendant say, if anything, after the shooting took place? A. I never heard him make any remark. Q. What did the defendant do after the shooting; where did he go? A. He came to Cushing. Q. What did he say, if anything about going to Cushing? A. He just spoke and said, 'I guess I will go in and give up.' Q. Tell the jury what he did. A. Got in the car and drove towards town; met the deputy sheriff out there. I think there were two more fellows in the car. The deputy got in front with Fitzsimmons and we came in town."

His cross-examination was in part as follows:

"Q. You say you have known Jim Fitzsimmons for how long? A. About two years, I guess. Q. Strong personal friend of his? A. Yes, sir. Q. You were not present at the preliminary hearing of this case? A. No, sir. Q. Did you know Billie Reed? A. No, sir; I don't know her. Q. Did you see a girl brought in there that day by Fitzsimmons? A. I seen some girl in the back end of the car as they drove up there. I never seen her in the house."

The testimony of Arthur Hendricks was in substance the same as that of the witness McClerken.

Chris L. Glacken testified: That on the day of the killing he left Cushing about noon and rode with the defendant to Drumright in his automobile; that he saw the boy they called "Happy Jack" at Drumright that afternoon and had a talk with him, and "Happy Jack" said:

"Say, Chris, you must want to get killed; if you run around with Fitzsimmons you are liable to get in bad —liable to get killed; that son of a bitch refused to go on my bond, and I am going to get him."

That between 4 and 5 o'clock he started back to Cushing with the defendant and there was a girl in the back end of the car; that between Drumright and the Line House he asked the defendant what the trouble between him and "Happy Jack" was, and told him of the threat that "Happy Jack" had made against him; that when they reached the Line House Roy McClerken came out and asked if there was room for two passengers to go to Cushing, and they stopped and went into the building. He further testified as follows:

"Q. Now, go on in your own way and tell the jury what took place? A. Well, we went in the place, there was four or five people standing at the bar. Happy Jack was standing I should judge five or six feet from the door, but turned around to the bar with his back to the bar. McClerken walked in first. I followed him and Fitzsimmons behind him. First thing I know, 'Happy Jack' said, 'There is that dirty son of a bitch that would not go on my bond; I guess I will take him on.' He comes towards Fitzsimmons, and Fitzsimmons backed up and said, 'Happy, I do not want no trouble with you; I am your friend; I have been your friend; I don't want no trouble with you.' He kept coming, and Fitzsimmons backed up until he went into the east wall; he fired a shot at him, and he fell on his left side. Q. Did 'Happy Jack' have anything in his hand? A. He had an iron in his hand; yes, sir, when he started he did. Q. Do you know where he got that iron? A. I could not swear where he got it."

As a witness in his own behalf the defendant testified that he had known Jack Corrigan for about a year and a half; that at one time Corrigan sent for him to come to the county jail, and he went there, and Corrigan asked him to sign his bond, and he told him he could not qualify on his bond; that he had signed too many bonds, and they

would not take him on any more; that the next time he saw him was at Drumright on the day of the killing; and that afternoon he started from Drumright to Cushing with two passengers, Chris Glacken and a lady. He further testified as follows:

"Q. What, if anything, did Glacken tell you? A. He told me to look out, that he would kill me. Q. Whom did you see first when you got to the Line House? A. Roy McClerken hallooed to me; he asked me if I could take a couple of passengers. I told him, 'Yes,' I had plenty of room; he said, 'Wait a minute, and we'll go with you.' Q. Then what did you do? A. I got out and went in. Q. Now you tell the jury what took place after you went in there. A. I walked in the door; the bar comes right out to the door, and there were two or three standing up along the bar. It is only a short bar; it runs to the window on the west side of the house. When I walked in I walked east of them, over towards where this Roy McClerken was; this Jack turned around and said, 'There is that son of a bitch now; he would not go on my bond.' I says 'Jack, let's don't have any trouble; I never done anything to you,' and he reached back, I don't know where, and got something off this bar, or out of the window; he picked up something and made for me. I backed straight back; I was going towards the east wall; he kept coming forward; I told him to stop; he raised up this, whatever it was in his hand, something looked like a big rock or piece of iron; I pulled my pistol and shot him. Q. Where did you go after the shooting? A. I got in my car and started to Cushing. Q. Who was with you? A. Roy McClerken, Chris Glacken, and Hendricks."

On cross-examination he testified:

"Q. Were you on any bond at that time for Chris Glacken? A. Yes, sir. Q. Were you on a bond for Roy McClerken? A. Not at that time. Q. I will ask you if you didn't state a few minutes ago he came running at you with something you could not tell what it was, in

his hand? A. I could not tell exactly what it was, it was something he picked up. Q. Do you know Billie Reed? A. I know her when I see her. Q. Mr. Fitzsimmons, I will ask you if you have been heretofore tried in this court for a violation of the liquor law and a verdict of guilty returned against you? (No answer.) By the Court: Answer the question. A. Yes, sir. Q. How long was it since that time? A. I think it was a year last April. It was in the spring term of court."

The errors assigned will be considered in the order in which they are presented in the defendant's brief. In instructing the jury concerning the right of the defendant to defend his person, the court gave the following instruction:

"You are instructed that every one has the right to act in his own self-defense, and use such means and force as appears to him reasonably necessary to ward off an attack or to save himself from danger. And if you find from the evidence in this case that the deceased, Jack Corrigan, began an attack upon the defendant with an iron wedge or hammer, then the defendant had the right to defend himself with such means and force as appeared reasonably necessary to ward off the attack. But he had no right under the law to use any more force than appeared to be reasonably necessary to save himself. One may not resort to a deadly firearm in an ordinary fight, unless there is a real or apparent danger of his life being taken or great bodily harm done him. And in this case, if you find from the evidence that the deceased commenced an attack upon the defendant, and advanced upon him with the iron wedge or hammer that has been introduced in evidence in this case, and further find that the defendant drew his revolver, and shot and killed the deceased, and if you further find from the evidence beyond a reasonable doubt that it was unnecessary, and did not reasonably appear to be necessary, to shoot and kill the deceased, in order to save his life or his person

from great bodily harm, then the defendant would be guilty of manslaughter in the first degree. (Excepted to by John P. Hickam, attorney for defendant. Exception allowed. A. H. Huston, Judge.)"

The argument is that this instruction is erroneous:

"Because it puts the defendant under the burden of proving that the deceased was the aggressor, and fails anywhere to define 'the appearance of danger,' and that the situation must be viewed from 'the standpoint of the defendant,' and utterly fails to advise the jury what the defendant had a right to do under the theory presented by the evidence."

It appears that counsel for the defendant presented no request for instructions, and this exception and another to an instruction defining murder and manslaughter in the language of the statute were the only exceptions taken to the instructions given. We think the instruction itself answers the criticisms, and shows them not to be well founded, with one exception; that is, it omits to state that the appearance of danger is to be viewed from the defendant's standpoint. However, the defendant in his testimony does not state that at the time he fired the fatal shot it reasonably appeared to him that he was in danger of losing his life or suffering serious bodily injury at the hands of the deceased, and while the testimony of the defendant and his witnesses tended to show that the deceased had made threats against the defendant, and that he was the aggressor, there is no testimony showing that the defendant believed that he was in danger of losing his life or suffering serious bodily injury at the hands of the deceased at the time he fired the fatal shot. It is elementary that a person assaulted is justified in using so much force as is necessary to his defense; however, to repel a slight assault, the person assaulted will not be

justified in doing those acts that are calculated to destroy the life of his assailant, unless the assault is of such a character as to endanger his life, or inflict on him serious bodily injury, or to excite his fears as a reasonable man that such would be the result of the assault. The law limits him to such acts as are necessary to self-defense, and the appearance of danger is to be viewed from his standpoint, and as he saw it.

In another instruction the court defined justifiable homicide in the language of the statute. Penal Code, sec. 2334, Rev. Laws 1910. In the closing paragraph of the instruction criticized the court instructed the jury that unless they—

"find from the evidence beyond a reasonable doubt that it was unnecessary, and did not reasonably appear to be necessary, to shoot and kill the deceased in order to save his life or his person from great bodily harm, then the defendant would be guilty of manslaughter in the first degree."

We think this was as favorable to the defendant as he could demand. Our Procedure Criminal provides:

"Upon a trial for murder the commission of the homicde by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." (Section 5902, Rev. Laws 1910.)

Under this section of the statute the presumption of innocence has been overcome when the commission of the homicide by the defendant is proven beyond a reasonable doubt. A presumption of guilt then obtains, unless

the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable, and thereupon the burden shifts to the defendant to produce sufficient testimony to raise a reasonable doubt, either as to the degree of homicide, or as to his justification or excuse. If the defendant discharges this burden, then it returns to the prosecution, and, to warrant a conviction, the presumption must overcome such reasonable doubt thus raised by proof beyond a reasonable doubt of each essential element of the crime. *Culpepper v. State,* 4 Okla. Cr. 103, 111 Pac. 679, 31 L. R. A. (N. S.) 1166, 140 Am. St. Rep. 668; *Lumpkin v. State,* 5 Okla. Cr. 488, 115 Pac. 478; *Williams v. State,* 9 Okla. Cr. 206, 131 Pac. 179; *Alberty v. State,* 10 Okla. Cr. 616, 140 Pac. 1025, 52 L. R. A. (N. S.) 248.

Our Procedure Criminal provides that:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict, and if it state the testimony of the case, it must in addition inform the jury that they are the exclusive judges of all questions of fact. Either party may present to the court any written charge and request that it be given. If the court thinks it correct and pertinent, it must be given; if not, it must be refused." (Section 5905, Rev. Laws 1910.)

Under this provision, if counsel for the defendant desires the court to give any particular instruction, or that one that is given be made more specific or comprehensive, it is the duty of counsel to prepare and present to the court such desired instruction and request that it be given, and in the absence of such request a conviction will not be reversed, unless this court is of the

opinion, in the light of the entire record, including the instructions given, that the defendant may have been prejudiced by the erroneous instruction given and to which an exception was duly taken. We are of the opinion that the instructions given, taken as a whole, substantially presented the law of the case fairly.

Counsel in their brief say:

"The only other points we desire to make go to the question of the admissibility of the evidence offered by the state. As has been said, this defendant, as far as the material facts of the homicide are concerned, was confronted at his trial by no witness. The testimony introduced, and under which he was convicted, was read from the stenographer's notes, reduced to writing, as made at the preliminary trial. Timely objections were made at various points to the introduction of this evidence. The only point in relation thereto that we care to urge is the claim that the foundation, or showing, necessary to be made as a predicate for the introduction of the evidence, was not sufficient; that is to say, that it was not shown that the witnesses, or either of them, were dead, insane, sick, and unable to testify, beyond the jurisdiction of the court, or that sufficient diligence had been used in the premises."

Considering the competency of the testimony as it is met by the objections urged, it appears that the first witness called by the state was Albert Dinwiddie, a deputy court clerk, who testified that he was also official stenographer for the county court, and as such took testimony of the witnesses J. W. Barrett and J. R. Long upon the defendant's preliminary examination, and as clerk of the court he produced the files and identified the original complaint as filed before the committing magistate, including the order indorsed thereon holding the defendant to the district court. He identified the præcipe for sub-

poenas for witnesses J. W. Barrett and J. R. Long, which was filed on September 15, 1915; also the affidavit of the assistant attorney showing that said witnesses were non-residents of Payne county; also the subpoenas for said witnesses, issued September 24th, directed to the sheriff of Creek county, and the return of said sheriff, showing that said witnesses could not be found in Creek county. And the same was offered in evidence. He further testified to the correctness of his report of the testimony of said witnesses as given upon the preliminary examination of the defendant and that the same was duly certified to by him. Thereupon the transcript was offered in evidence. The defense objected on the ground:

"That the showing as required by law has not been made. By the Court: You have offered a subpoena and two names on there. You ought to show that they are without the jurisdiction of the court, before you can offer secondary evidence. I think there is no doubt as to the rule; you cannot show it by merely a return on a subpoena. Have you any witnesses you can prove this by? By Mr. Turner: None except myself. I will go on the stand and take oath that those people are not in the state."

Thereupon A. W. Turner was sworn and took the stand. The defense objected to this witness testifying— "for the reason that his name and post office address was not furnished to the defendant, as required by the Constitution of the state, and for the further reason that his name is not indorsed upon the information. By the Court: He does not testify to any facts of the case. He only testifies towards laying the foundation for offering other testimony. (Objection overruled and exception allowed.)"

He testified as follows:

"That J. W. Barrett and J. R. Long are the witnesses whose evidence is sought to be introduced by the transcript; that from every source or information I could get, and covering within the last two months of diligent search, I know that these two witnesses are not within the jurisdiction of this court, and their whereabouts are unknown. I don't know whether they are outside of the state or not. I can't definitely state that. I do know their whereabouts are absolutely unknown so far as the state has been able to trace them."

Cross examination by Mr. Hickam:

"Q. You may state, Mr. Turner, to what extent you personally know that their whereabouts is not known. Have you any information, except the return of that subpoena, only hearsay? A. One can only acquire knowledge of that kind by hearsay. I went over in Drumright, and inquired of Mr. Long's people over there (that is, his associates) if they knew where he was, and Mr. Barrett's also, and they told me he had gone, and they didn't know where he had gone. Mr. Billy Derrig, deputy sheriff, tells me he has made diligent search in this county, and cannot find these two witnesses, or any of them, except Billie Reed, whose evidence is not in this transcript; that he made diligent search for her and at one time found her. Service was had on her, as the sheriff's return will show, in this county, and she went away. I talked with Mr. Bradley, deputy sheriff of Creek county, who served these papers over there, and he told me that he had searched Creek county high and low, but could not find these witnesses, and could not trace their whereabouts."

Thereupon the transcript of the testimony of the witnesses Barrett and Long was again offered, and the defense renewed their objections, which were overruled, and the testimony of said witnesses as taken on the preliminary examination was read to the jury.

Upon a careful consideration of the evidence we think that the objections were properly overruled. There was no error committed in allowing the subpoenas for these witnesses, that had been issued and returned unserved, to be received in evidence for the purpose of showing what had been done towards making service upon the missing witnesses. As was said in *Jeffries v. State* 3 Okla. Cr. 146, 162 Pac. 1137:

"The objection to this is based upon the contention: First, that the state only proved by hearsay that Belmay was absent from the state; and, second, that the name of the stenographer who identified the evidence as that taken at the preliminary, and the witnesses used to prove Belmay's absence, were not indorsed on the information. And defendant relies upon *Driggers v. U. S.* 1 Okla. Cr. 167, 95 Pac. 612, 129 Am. St. Rep. 823, to support his first contention. But the doctrine announced in *Driggers v. U. S.* has never been followed by this court, and, we think, is not the law. Under the doctrine insisted upon by the defendant, the state would not be allowed to use the former testimony of an absent witness, unless it could produce some one who saw him cross the state line, and could then swear with equal positiveness that he had never returned. Such was never contemplated by the law. But this court has followed the doctrine, announced by Mr. Wigmore, that 'if the witness has disappeared from observation, he is in effect unavailable for the purpose of compelling his attendance.' Such a disappearance is shown by the party's inability to find him after diligent search. The only objection to recognizing this ground of unavailability is to the possibility of collusion between party and witness; but, supposing the court to be satisfied that there has been no collusion, and that the search has been *bona fide,* this objection loses all of its force. For former testimony this cause of unavailability has long been recognized. Wigmore on Evidence, vol. 2, par. 1405; *Warren v. State,* 6 Okla. Cr. 1, 115 Pac. 812, 34 L. R. A.

(N. S.) 1121; *Edwards v. State,* 9 Okla. Cr. 306, 131 Pac. 956, 44 L. R. A. (N. S.) 701; *Henry v. State,* 10 Okla. Cr. 369, 136 Pac. 982, 52 L. R. A. (N. S.) 113."

It is sufficient answer to the contentions made to say that we think, after a careful survey of the facts in evidence, that the testimony was susceptible of only two conclusions; that, taking the case as made by the state, it was a deliberate, cold-blooded, fiendish murder, and, taking the testimony of the defendant, he is, we think, guilty of manslaughter in the first degree upon his own statement. To hold that the testimony of the defendant and his witnesses established the defense of justifiable homicide would be to upset all well-settled rules and statutes, which point out the duty of one engaged in a quarrel, and the necessity of his avoiding the attack, if in his power, and, at most, to use only such force as was necessary to prevent injury to himself.

We ought not to close this review without adverting to the fact that the defendant was carrying a pistol in violation of the statute making it a misdemeanor; that when he fired the fatal shot he was surrounded by his friends, and, although he was their bondsman, they did not appear to testify at his preliminary examination, which was held on the day following that of the homicide, and the undisputed testimony of the witnesses at the preliminary examination made out a case of unprovoked murder. Upon the final trial all of these witnesses were missing, and while it does not appear that they were absent through the connivance or by the procurement of the defendant, it was to his advantage.

Discovering no prejudicial error in the record, the judgment is affirmed. The court clerk of Payne county

is directed to issue forthwith to the sheriff of said county a commitment in accordance with the judgment and sentence of the court.

ARMSTRONG and MATSON, JJ., concur.