James William FLETCHER,
Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12969.

Court of Criminal Appeals of Oklahoma.

June 7, 1961.

Rehearing Denied Sept. 20, 1961.

H. M. Redwine, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

NIX, Presiding Judge.

The plaintiff in error, James William Fletcher, was charged by information in the District Court of Logan County with the crime of robbery with firearms. He was found guilty by a jury. They left the punishment to be assessed by the trial judge who sentenced defendant to a term of 10 years in the Oklahoma State Penitentiary.

The defendant lodged his appeal in this Court within the time prescribed by law. Defendant asserts some fourteen (14) assignments of error in his brief. The assignments worthy of discussion will be discussed in the order in which they appear in defendant's brief.

Defendant first contends that the court committed reversible error in permitting the testimony of the state witness Verla Nadine Sanders given at the preliminary hearing to be introduced at the trial and read to the jury over the objection and exception of defendant. Defense counsel argues that the predicate laid by the state was inadequate under all the facts and circumstances of the case. This does not constitute a new question before this Court but has been passed upon numerous times and as was said by this Court in the case of Bryant v. State, 33 Okl.Cr. 383, 244 P. 453, 454:

> "It is the well-established doctrine in this state, that where the testimony of the witness was given at a preliminary

examination, and taken down by the reporter in the presence of the defendant and his counsel, who cross-examined him, and such testimony was filed with the clerk, the transcript is admissible, where the witness is not present and cannot be found in the jurisdiction."

Also see Fitzsimmons v. State, 14 Okl.Cr. 80, 166 P. 453; Jeffries v. State, 13 Okl.Cr. 146, 162 P. 1137; Henry v. State, 10 Okl. Cr. 369, 136 P. 982, 51 L.R.A.,N.S., 113; Valentine v. State, 16 Okl.Cr. 76, 194 P. 254; Clark v. State, 63 Okl.Cr. 138, 149, 73 P.2d 481.

The limitation to this rule is thoroughly discussed in the case of Davis v. State, 20 Okl.Cr. 203, 201 P. 1001. It is obvious that the majority rule is based upon circumstances of necessity and the transcript or deposition of the testifying witness shall be excluded in all cases where the witness can be produced in person. This is of course, based upon the grounds that the accused may desire to cross-examine the witness further, and that the jury be given an opportunity to observe the witness and his demeanor on the witness stand. It is not unusual that the cross-examination of the witness in a preliminary trial is more or less perfunctory, and that by time the case comes on for final trial the defendant is better able to conduct a thorough cross-examination, and if it is proper for the testimony to be produced, it is the right of the defendant to have the witness present. Diligent effort made in good faith to produce the witness at the trial should be shown. See Golden v. State, 23 Okl.Cr. 243, 214 P. 946. The defendant is entitled to be confronted with witness who appears against him face to face. Therefore, a showing of due diligence must be made to lay the predicate for introduction of a transcript of the testimony of a previous preliminary hearing.

In the instant case the Court is of the opinion that such a showing was made and constituted adequate predicate for introduction of the transcript.

■ The state produced the sheriff, Nolen Welch, who identified a subpoena which had been issued for the witness Sanders, and which showed no service upon the witness. He stated he was unable to locate the witness. That he had contacted the police department in Oklahoma City as well as the sheriff's office and was not able to locate the witness. He also stated that he had searched for her in Logan County. That he had contacted the police department at Lubbock, Texas, where witness Sanders had a brother-in-law. The brother-in-law could give no information except she could be in New Mexico or Arizona. The sheriff also said he had contacted the tag office in Austin, Texas, trying to locate the finance corporation who carried the paper on the witness's car. The sheriff corresponded with the finance company who told the sheriff the car had been wrecked and was in storage and was past due with the payments. That he had made every possible effort to locate the witness but was unable to do so. That he had contacted the parents of the witness and had made regular checks with the Ione Hotel and that he had several spotters out trying to find the witness in other towns such as Enid and Duncan where the sheriffs' offices were alerted to pick up the witness on sight. The sheriff said he was unable to locate the witness in the state. This Court is of the opinion that the sheriff made every effort to serve the subpoena that the law would require. The case made reflects that at the conclusion of Sheriff Nelson's testimony the court asked of the witness the following question:

"Q. You tell the court that you have made a diligent search in Logan County and the state of Oklahoma for this witness, and that you cannot find her. A. I have, Your Honor.

"Q. And that she is absent and cannot be located and produced at this time. A. I have been unable to produce her."

The Court feels that diligent effort had been made to produce the witness and that sufficient predicate was laid to make admissible the transcript.

█ We attach little significance to defendant's contention that the trial court erred in excluding from the jury certain remarks made by the county attorney which appeared in the transcript. The remarks to which defendant refers were made on two or three occasions as a result of defense counsel's objection as to the state leading the witness. The county attorney said in substance that the witness was a "reluctant witness" and the remarks were to justify his leading tactics. The remarks were addressed to the court and were no more than bickering among the attorneys. They constituted no part of the evidence. The jury could deduct from the testimony of the witness whether or not her answers were indicative of reluctancy. This deduction should have been made by the jury from the testimony and not from the remarks of the attorneys. It was a matter that could easily have been argued to the jury, but the final decision was to be made not upon remarks by the attorney during objection but from the testimony given by the witness. It did not constitute error to keep said remarks from the jury.

█ Defendant next contends that the court erred in not sustaining defendant's demurrer to the evidence and in failing to instruct the jury to return a verdict for the defendant. The evidence reveals that on the 19th day of December, 1959, three men came to the room of the prosecuting witness who was occupying room 202 at the Ione Hotel in the City of Guthrie. The time of their arrival was approximately 4 a. m. They were accompanied by the night porter of the hotel. They knocked on the door and according to the testimony of the prosecuting witness the following transpired:

"A. Well, somebody knocked and I went to the door and they came in the room, the bell boy and three men.

"Q. And what happened then? A. Well, the tall slim one asked me did I have any money, and grabbed me by the hair of the head and asked me did I have any money and I told him no,

I had been to the bank, he said not to lie and he grabbed me again and one man hit me.

"Q. Now which man hit you? A. Fletcher.

"Q. This man, the defendant hit you in the stomach? A. Yes.

"Q. Well, did they take anything? A. I had $93.00 in my make up kit.

"Q. All right, what happened then? A. The tall slim guy took it and put it in his pocket.

"Q. What happened then? A. Well the tall slim guy said get your clothes on, we're going, and I said 'there's no use in taking me, you've got the money', and so he said to pack and so I started to the closet real slow and so he started packing for me, and so he just threw me in there and they took me out.

"Q. And where did they take you to? A. Well they took me downstairs first, the one paid the rent and there was a car parked out there and we got in the car."

According to the testimony the witness Nadine Sanders was taken by the three men to Shawnee, Oklahoma, where a room was rented at a motel and all spent the night. The following day she was taken to the bus station in Oklahoma City and released.

A policeman had taken the tag number of the vehicle parked by the hotel while the three men were in the hotel. It was later traced to the defendant who was apprehended.

During the trial upon direct examination witness was asked:

"Q. And the defendant was there at all times? A. Yes.

"Q. Fletcher. A. Yes.

"Q. And that was here in Logan County at the Ione Hotel? A. Yes."

Upon cross-examination defense counsel inquired as follows:

"Q. (to defendant) now stand up. Is this the man you said hit you? A. Yes.

"Q. What is his name? A. James William Fletcher.

"Q. How long have you known him? I never knew him before, I never saw him before.

"Q. You never saw him before that night? A. No.

"Q. Now who told you his name was James William Fletcher? A. The police."

William Jones, Jr. testified he was the night porter at the Ione Hotel the night in question and that three men entered the hotel about 4 a. m. and went directly to the elevator. That when he approached the elevator the men jerked him into the elevator and asked to be taken to Room 200. The testimony in that regard was as follows:

"Q. Do you see in the courtroom at this time either one of those three men who came in that door at the time about which you have just related? A. Yes, sir.

"Q. Will you point him out? A. It is Fletcher over there (indicating).

"Q. Which one? A. The one right here (indicating).

"Q. Well, this is the attorney and this is somebody else, now, which one do you mean? A. The one with the white shirt and the brown tie.

"Q. Was he one of the three men who came in the hotel? A. He was.

"Q. Are you positive as to that? A. Yes, sir.

"Q. Now, you say they went to the elevator? A. Yes, sir.

"Q. Tell us what they did, whether they entered the elevator or what did they do? A. When they first come up to the elevator I walked over slowly towards the elevator, and when I got close to the elevator I made a half step backward as if I refused to carry them up because they didn't go by the desk or anything, and he said he wanted to go to 200."

The porter further testified as follows:

"A. Well, he asked me where was this girl, what room she was in.

"Q. And what did you say? A. Well, after he turned around as if he might do something to me, I said 'probably she is in 202.'

"Q. Well, now what do you mean 'probably'—how did they conduct themselves with reference to their hands? A. Well, most of the time while they was out in the hall they had their hands in their pockets.

"Q. Do you know whether they were gloved or not? Did you see whether they had gloves on or not? A. No, I—

"Q. You don't remember? A. No.

"Q. You don't remember these little details? A. I don't remember but one pair of gloves.

"Q. You don't remember but one pair of gloves, do you know who had on that pair of gloves? A. Well, the guy that was in front of me. He didn't have on the gloves until we got in the room, and then he went into his inside coat pocket and brought out some real thin gloves and put them on.

"Q. Now, how did you folks get into this Room 202, what did they say to you about opening that door, if anything? A. They told me if I didn't open that door they was going to kick it in.

"Q. And what did you say? A. I said, 'Well, I'll go get the key'.

"Q. And what did they say? A. Well, I turned to go get the key and they said, 'Never mind, we won't need the key, we're going to kick it in'. They said 'If you don't open it we're going to kick it in'.

"Q. Then what happened, just tell the jury what happened? A. Well, they knocked on it several times and then she roused up and opened the

door a little and they just pushed it on open.

"Q. Did you observe how this woman was dressed, was she dressed for bed, or otherwise, or do you remember? A. As close as I remember she was.

"Q. Well, now, did you go into the room ahead of them, or how? A. No, I didn't.

"Q. Were you still between the men? A. Yes, a little later afterwards, he went in. This other guy that went in first, he say 'You come in and you get over there and you sit down in the corner and keep your mouth shut'. I mean, those are not the actual words he said but—

"Q. Well, what did he say? A. He said, he tol' me 'You get over there and keep your damn mouth shut'.

"Q. Was Mr. Fletcher, this defendant here, in that room with you at the time that these other two men and Mrs. Sanders were there? A. Yes, he was. After I come in, he come in next and then another guy come in and stood at the door.

"Q. The last one stood by the door? A. Yes, sir.

"Q. Now, tell the jury just exactly what was said and by whom. A. Well, this man that first went in, he asked her for the money and she say, 'I don't have any money', she kept saying 'I don't have any money'.

"Q. What, if anything, did he do? A. Well, then he said 'You have to be screwed', and that's when he struck her in the stomach.

"Q. Did you see anyone there grab her by the hair? A. Yes.

"Mr. Redwine: Now we object to that as a leading question.

"The Court: Sustained.

"Q. Well, what I want to know is exactly what happened and how as it happened? A. Well, when we first went in he asked her where the money was and she said, 'I don't have any', and they said, 'There's no use to kid us, we know you've got some money', and so she was sitting on the edge of the bed and then by that time he grabbed her by the hair and pulled her up and then he struck her in the stomach.

"Q. Now, who grabbed her by the hair and pulled her up? A. The first man that went inside the room.

"Q. Now, who if anyone, did you see strike this woman in the stomach? A. It was Fletcher that struck her in the stomach.

"Q. This man right over here? A. Yes sir.

"Q. How did he strike her in the stomach? A. He just hauled off with his fist and struck her in the stomach and she bent about double.

"Q. Did you make any effort to help her? A. No sir.

"Q. Why didn't you help her? A. Well, I was scared. He told me to keep my mouth shut, and I was scared to do anything at all.

"Q. Now, go ahead and tell what you saw that happened there in the presence of this defendant, Fletcher, and what he did, if anything. A. Well, he told this first guy that entered into the room—

"Q. Who told the first guy? A. Fletcher, he say 'Well, let me talk to her', and he asked her about the money like the first one did and she denied having any money all the time until he hit her in the stomach, and she had a little overnight bag sitting up there on the dresser and she said 'It's in there'.

"Q. She said what? A. She said 'The money is in there'.

"Q. And who was she talking to when she said that? A. Well, at first she was talking to the first guy that entered the room, and then to

Fletcher. The third guy never said a word to her.

"Q. Now, as I understand you, Fletcher is the one that hit her in the stomach when he said 'Let me talk to her'? A. He was one of the two, yes sir.

"Q. What happened when she told him the money was in the night bag, or wherever it was? A. Well, she had to go get her key to open it.

"Q. Did she get the key? A. She did.

"Q. Who opened it? A. This first guy that entered the room, he was the one that opened it.

"Q. Who, if anyone, examined the bag, or which ones? A. Well, it was the first one that entered the room, he was the one that examined the bag and taken the money and put it in his inside coat pocket."

Defendant testified that on the night in question he went to a night club known as Louie's 29 in Oklahoma City about 10:00 or 10:30 p. m.; drank with Jerry Davis and friend and became drunk. That he and Jerry went to defendant's car and he thought Jerry was driving him home. Defendant said he laid down in the back seat. Jerry went back in the club and returned. Defendant said he raised up and saw three men in the front seat as the car began to move. He laid back down and awakened in Shawnee and there were three people in the front seat and one was getting out. Defendant remarked as follows:

"A. The next thing I knew I was in Shawnee, Oklahoma.

"Q. You were in Shawnee, Oklahoma? A. Parked in front of a tourist court.

"Q. How were you aroused, if you were aroused? A. Oh, they just shook me and woke me up, I was laying there all cramped up and had luggage on top of me, and there was these three people in the front seat and one of them

getting out and I said, 'What's going on here?', and they said, 'Well, we're going to get some rest', and I said, 'Well, why did you go to the Rail Fence?', that's a place out on South Shields in Oklahoma City, and I asked them why they went out there, and they said, 'Oh, we're in Shawnee', and that's when I started raising a little Cain, I said 'I owe $300.00 on this car to my sister that I borrowed the money from and you all driving along and me laying back here drunk and you get arrested and me back here and I go to jail', so one of the boys went in to rent a cabin and he comes out with the man and they go look at it and they come back and he comes back over and said, 'Well, I got one', I forget what he said it cost, so we drove over there and got out and went in, and these two fellows had a girl so we go into this cabin and the two fellows pull off their clothes and go to bed and the girl has got a transistor radio and she is playing it, so one of them gets in one bed and one of them gets in the other and I said, 'well, what's going on, who are you with' and she says, 'Well, they just came and got me and brought me over here to get some money for them.' "

Defendant further contends that when he discovered what had transpired he insisted on taking the girl home.

There is much testimony relating to the circumstances surrounding the event that is highly controversial. However, this Court has consistently held that it is the duty of the jury to hear the testimony and ferret out the truth. Before this Court will interfere with the verdict of the jury on grounds that the evidence was insufficient to sustain conviction, there must be no competent evidence in the record upon which the verdict could be based. See Sheehan v. State, 83 Okl.Cr. 41, 172 P.2d 809. The general rule was well stated in the case of Riddle v. State, 92 Okl.Cr. 397, 223 P.2d 379, where the Court said

"Judgment of conviction will not be reversed on ground that verdict is not supported by evidence, unless there is no substantial evidence tending to show guilt or evidence fails so far to support verdict that necessary inference is that jury must have acted from partiality, passion or prejudice." Also see Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812; Campbell v. State, 95 Okl.Cr. 396, 247 P.2d 281.

In the instant case the corpus delicti was established by competent evidence. The defendant was identified by two eye witnesses. The car used was traced to the defendant, therefore, regardless of the controversy the jury had before them sufficient evidence, if believed, to support their verdict. It is apparent from the testimony that the prosecuting witness was engaged in the field of prostitution and had numerous arrests. The defendant had numerous felony convictions but of the two, the jury chose to believe the prosecuting witness. That was within their province. Her testimony along with that of the night porter of the Ione Hotel was sufficient to establish the crime and defendant's participation therein. Therefore, this Court is not in accord with defendant's contention that the Court erred in not sustaining a demurrer to the evidence or directing a verdict for the defendant.

Defendant further contends that the court erred in refusing to give certain requested instructions which were as follows:

"Defendant's Requested Instruction No. 1:

"You are instructed that the placing of witness, Nadine Sanders, under a 'material witness bond' prior to the preliminary hearing by the County Court of this county, at the time acting as a committing magistrate, was illegal and contrary to law. In this regard, you are further instructed that you may take such fact of illegal arrest and incarceration of the witness, Nadine Sanders, into consideration for the purpose of how same may have or

did affect her credibility as a witness at the preliminary hearing."

"Defendant's Requested Instruction No. 3:

"You are instructed that the crime of Vagrancy as charged against the witness, Nadine Sanders, in case No.—— is a misdemeanor. In this regard you are further instructed that no officer of law is authorized to arrest and jail a person on a misdemeanor without a warrant for arrest of such person, unless the misdemeanor was committed in the presence of the arresting officer * * *"

"Defendant's Requested Instruction No. 6:

"You are instructed that it is unlawful for any person to use any force, threats, duress, restraint of person of a witness with the purpose or intent to affect the testimony of a witness in any judicial proceeding. Likewise it is unlawful for any person to practice any fraud or deceit, or knowingly make or exhibit any false statement, representation, token or writing, to any witness or person about to be called as a witness upon trial, proceedings, inquiry or investigation whatsoever, with intent to affect the testimony of such witness. The foregoing applies to officers of the law, as well as to civilians, for when officers so act they no longer are instruments of lawful administration of justice but become a law unto themselves. If you believe that duress or coercion or other unauthorized practices were used to procure the testimony of any witness, then you may take same into your consideration as to the weight and credit you give the testimony of such witnesses. Testimony unlawfully obtained or produced as aforesaid is entitled to the smallest credit, and of itself is insufficient to support a conviction. Given in part as shown by Instruction #8, exception allowed defendant."

This Court has always abided by the rule that instructions must be considered as a whole, and when so considered together, if they fairly and correctly state the law applicable to the case they will be sufficient. We find in the instant case that the substance of defendant's individual instructions were fairly covered in instruction No. 8 given by the trial judge, which read as follows:

"You are instructed that it is unlawful for any person to use any force, threats, duress, restraint of persons on or of a witness with the purpose or intent to affect the testimony of such witness in any judicial proceeding. The foregoing applies to officers of the law as well as to civilians. If you believe that duress or coercion, or other unauthorized practices were used to procure the testimony of any witness, then you may take same into your consideration as to the weight and credit you give the testimony of such witness. Testimony unlawfully obtained and produced, as aforesaid, is entitled to the smallest credit and of itself is insufficient to support a conviction."

This instruction appears to adequately state the law and covers the subject pursued by defendant's request. The attorney general cites in support of the court's instruction the case of Cawley v. State, 96 Okl.Cr. 53, 248 P.2d 273, 275, wherein the court said:

"Introduction into evidence, at the trial of another, of the testimony of a witness, who was arrested without process, and restrained in jail, both prior to giving his evidence at the preliminary hearing, and prior to the trial, does not constitute a denial of due process, but goes to the witness' credibility, which under such conditions is entitled to the smallest credit though it might have been believed. Such evidence standing alone and unsupported by other evidence, may not be sufficient to sustain a conviction, but where amply supported, and when considered with the other evidence, may be sufficient to sustain a conviction."

This Court is of the opinion that the instructions given by the trial court when considered in whole and together, fairly and correctly stated the law applicable to the case at bar and were sufficient. The general rule as adopted by the Court as it pertains to this question was well stated in the case of Bourns v. State, 57 Okl.Cr. 377, 48 P.2d 353:

"Where the instructions of the court fairly and impartially cover all of the issues in the case, it is not error to refuse requested instructions as to the law covered by the general instructions."

Defendant argues that the court's instructions 3 and 4 were erroneous and constituted error. It appears that the two instructions were given—No. 3 to relate the elements of the crime of robbery; No. 4 was given to define the crime of robbery by force. Instruction No. 4 was given in the exact language of the statute as related in 21 O.S.A. § 791 as follows:

"Robbery is a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. (R.L.1910, § 2364)."

Defendant contends that the defendant had no intent to steal or assist another to steal property from the prosecuting witness nor did Jerry Davis, the co-defendant; and he cites in support of his contention the case of Johnson v. State, 24 Okl.Cr. 326, 218 P. 179, 181, where the court said:

"To constitute robbery the taking must in all cases be accompanied with a felonious intent, or animus furandi. If a party bona fide believe that property in the personal possession of another belong to him takes that property away from such person with menaces and violence, this is not robbery; and it is for the jury to say whether or not the accused did act under bona fide belief.

Where a person under a bona fide belief that the property is his own, obtains it by menaces, there is a trespass, but no robbery."

Defendant as a result of the reasoning in the Johnson case, supra, contends that it was the duty of the trial court to instruct the jury that the property must have been taken with the intent to steal. Defendant cites State v. Fordham, 13 N.D. 494, 101 N.W. 888, wherein the court said:

"It is the duty of the trial court to charge the jury in direct or equivalent terms that, to constitute robbery, the taking of the property must have been taken with the intent to steal it, even though not requested so to do, such intent being a substantive element of this crime."

However, this court in the case of Traxler v. State, 96 Okl.Cr. 231, 251 P.2d 815, 836, overruled the Johnson case, supra, and in reference to the definition of Title 21 O.S.A. 1951 § 791 said:

"* * * It would seem from the use of the word 'wrongful' that our definition is more limited than the common law definition and that no intent is necessary except the intention of doing the act denounced by the statute. The word 'wrongful' imports in its terms the infringement of some right, and 'wrongful taking' would seem to be any taking of personal property against the will of the possessor, and if accomplished by means of force or fear it is robbery. No state of mind or belief is involved. It is the infringement of the right that makes the act wrongful—something of more value than property is involved. It is the violation of that fundamental right so much cherished in free nations, 'of life, liberty and the pursuit of happiness', and where such rights are violated in the respect stated, coupled with violent means and method employed makes the act recited robbery, so far as defined by our statute. We are, therefore, compelled to overrule Johnson v. State,

supra, so far as it purports to adopt the common law definition of robbery as expressed in paragraph one of its syllabus. Such is our conclusion, though truly not easily arrived at by any means. But we are convinced from an examination of our legislative provisions that the efficiency and sufficiency of our definitive statute, Tit. 21 O.S. 1951 § 791, precludes and would not justify the reading in of words and definitive clauses not in the statute contained."

Also see People v. Jordan, 303 Ill. 316, 135 N.E. 729; Tones v. State, 48 Tex.Cr.R. 363, 88 S.W. 217, 1 L.R.A., N.S., 1024, 122 Am.Rep. 759; Wynn v. Commonwealth, 135 Ky. 447, 122 S.W. 516.

A review of the above cited cases convinces the Court that the court's instruction defining the crime as related by the statute was sufficient and that the court did not err in giving the same.

Defendant argues that in the closing argument to the jury the assistant county attorney made inflammatory and improper remarks to the jury. In support of the argument defendant lists several excerpts from the argument which defendant contends to be prejudicial. It is unnecessary to recite them here as defense counsel failed to object or except to any of the remarks during the course of the trial. This Court has carefully read the remarks about which the defendant complains and it appears that the assistant county attorney went out of the record and injected his personal opinion rather frequently. However, this court has adhered to the general rule as laid down in the case of Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927, 937, as follows:

"'Counsel for [defense] must not only object to alleged improper statement of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were

of such a character that the error would not be cured by a withdrawal of the remarks.'

\*  \*  \*  \*  \*  \*

" 'Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel.

" 'The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it. It is only when argument by counsel for the state is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument.' "

The remarks are such as not to constitute reversible error unless objections had been made and exceptions saved. Defendant is not permitted to remain silent and raise the question for the first time on appeal.

Defendant's last contention involved in substance the sufficiency of the information under which the defendant was charged. However, it is to be noted from a review of the record that no objections to the information were made prior to or during the course of the trial. No demurrer or motion to quash was interposed.

In the case of Parks v. State, 270 P.2d 366, 367, this Court quotes with approval the following language:

" \*  \*  \* but the court held that the defendant was too late with his objection, after trial; that he could not take chances of an acquittal upon the merits of the action, and then object to the information for not stating the offense in as definite terms as might have been done." Also, see Monahan v. State, 95 Okl.Cr. 234, 243 P.2d 744, 745.

The Court has given careful consideration to the very lengthy brief of defense counsel and it is the opinion of this Court that there is not error of sufficient gravity to justify a reversal. Therefore, the judgment and sentence of the trial court is affirmed.

BRETT and BUSSEY, JJ., concur.